# United States Court of Appeals
## For the First Circuit

No. 01-2541
    01-2603

NEW COMM WIRELESS SERVICES, INC., D/B/A MOVISTAR,
Plaintiff, Appellee,

v.

SPRINTCOM, INC., AND SPRINT SPECTRUM LP,
Defendants, Appellants.

CENTENNIAL PUERTO RICO LICENSE CORP.,
Intervenor, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpi, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,
Selya and Lipez, Circuit Judges.

Miguel J. Rodríguez Marxuach, with whom Fernando J. Gierbolini
was on brief, for defendants-appellants.
    Antonio L. Roig-Lorenzo, with whom Edgardo Rodríguez-
Quilichini and O'Neill & Borges were on brief, for intervenor-
appellant.
    Eycko O. Lugo-Rivera, with whom Carlos Berreteaga was on
brief, for appellee.

April 5, 2002

**SELYA**, <u>Circuit Judge</u>.  These interlocutory appeals implicate the brave new world of wireless communications.  In the underlying action, the district court sided with plaintiff-appellee New Comm Wireless Services ("Movistar") and issued a preliminary injunction against two related companies, SprintCom and Sprint Spectrum (collectively, "Sprint").  After clearing a path through the technological thicket, we reverse.

## I.  BACKGROUND

We divide our discussion of the relevant background into four segments.  Except as otherwise indicated, the facts are not disputed.

### A.  <u>The Wireless Revolution</u>.

The wireless telephone system challenges traditional concepts of the communications infrastructure.  Instead of poles and wires, service carriers use Signal IDs ("SIDs") to connect subscribers to their networks.  Each SID operates within a basic trading area ("BTA") — a specific geographic region, customarily linked with a major urban center.  The Federal Communications Commission licenses wireless communications companies to broadcast in particular BTAs and maintains a list of usable SIDs.  The private sector then takes over:  CIBERNET (a private company) administers the assignment of particular SIDs to licensed service carriers for specific BTAs.  Thus, a service carrier licensed to

broadcast in a given BTA (say, Pittsburgh) may apply for an SID for that BTA, and CIBERNET will assign one (say, 4171).

In this arcane endeavor, substance trumps form. Thus, even though SIDs are assigned to particular BTAs, the reality is that an SID may be broadcast in any BTA, as long as the carrier is appropriately licensed. If a carrier is licensed in, say, Richmond and Charlotte, it might choose to use the same SID in both cities. The net result is that few SIDs are broadcast in the BTAs to which they originally were assigned.[1]

To operate a wireless communications network, each handset must have a method by which it can access the service carrier's SID. This phenomenon — sometimes called "hooking" — is effected through a computer program known as a preferred roaming list ("PRL"). The PRL is installed in the subscriber's handset so that the handset will search for known SIDs in rank order and connect to the first available signal.

Since the BTA designation of a given SID has no necessary correlation with the SID's broadcast location, the construction of the PRL is vitally important. PRLs typically divide SIDs into "geo groups" — that is, groups of signals that are actually broadcast in particular regions. Within each geo group, SIDs are preferentially ranked. The PRL searches first for the most favored signal in a

_____

[1]This industry practice comes as no surprise to Movistar, which has licenses to broadcast separate SIDs for Mayaguez (5207) and San Juan (5205) — but uses the San Juan SID in both BTAs.

-3-

geo group and, if unsuccessful, works its way sequentially through the remaining SIDs in that group. It is therefore essential that service carriers, when programming their PRLs, have accurate information as to which SID is broadcast in which market, and that they place SIDs not only in the proper geo groups but also in the appropriate sequence within each geo group. The erroneous placement of an SID may either force a customer to roam onto an unwanted network or cause the handset to fail completely.

The number of BTAs in which a portable telephone can operate depends, then, on the number of SIDs programmed into the PRL for that instrument. Since subscribers usually want their telephones to function in as many regions as possible, carriers often enter into roaming agreements with other carriers. This process entails an exchange of SID information and augmentation of the parties' PRLs to increase the coverage area. Thus, if a subscriber leaves the area in which his service carrier broadcasts and enters a new area in which the carrier has established a roaming agreement with a local carrier (i.e., a carrier that serves the new area), the subscriber's handset automatically will hook into the local carrier's network.

Which SID is found by a subscriber's PRL is a matter of consequence beyond mere convenience. Most customers have contracts that provide for a certain number of prepaid minutes, and therefore receive a discount when their handsets hook into their carrier's

SID.  Once a user begins roaming on another carrier's network, however, that carrier typically will charge higher rates to the roamer.  Moreover, the subscriber's own carrier ordinarily receives no share of the proceeds from a call that is placed on a "roamed" carrier's network.

Most roaming agreements involve carriers that operate in different regions.  One notable exception comprises what is called "home-on-home" roaming.  The signatories to a home-on-home agreement operate in the same territory, but one of them usually cannot provide a signal to the entire region.  To compensate for this deficiency and ensure its subscribers comprehensive service, it enters a home-on-home agreement with a competitor.  Under such an agreement, a subscriber's handset will roam to the second carrier's signal when it is unable to hook into the subscribed carrier's signal — and this phenomenon occurs even though both carriers operate in the customer's "home" region.

### B.  **When Opposites Attract**.

The controversy before us involves a study in contrasts: a roaming agreement between Sprint (a large, well-established carrier with approximately 13,000,000 customers throughout the United States) and Movistar (a local carrier with approximately 190,000 customers, all in Puerto Rico).  At the time Movistar approached Sprint, the latter was not yet broadcasting a signal in Puerto Rico (although it was licensed to do so).  To close this gap

in its network, Sprint had entered into roaming arrangements with other service carriers, including Centennial Puerto Rico (Centennial). It aspired to broadcast its own signal in Puerto Rico, however, and had told any roaming partner that asked (including Centennial) that it planned to use the 5142 SID (an SID assigned to Sprint for the Virgin Islands BTA).[2]

Movistar was in a start-up mode. When Sprint and Movistar signed the roaming agreement (July 7, 1999), Movistar had been licensed and assigned SIDs to broadcast in both the San Juan and Mayaguez BTAs, but its service was not yet up and running. Movistar's marketing strategy was to advertise its embryonic network as capable of providing "automatic roaming" to customers traveling within the continental United States. This made Sprint an attractive roaming partner, for Sprint boasted of having established a "nationwide network."

Sprint drafted the Sprint/Movistar roaming agreement, using a form that it had developed for that purpose. In this document, the parties agreed to permit reciprocal roaming in areas in which one of them had no accessible SID. The agreement obligated Movistar to "take all actions necessary" to ensure that any Movistar customers who roamed "in a geographic service area

---

[2]As a courtesy, Sprint provided technical updates to its roaming partners on a bi-weekly basis, alerting them to changes in its network. These updates included information about Sprint's planned expansion into new markets and identified the SIDs that it proposed to use.

where Sprint PCS is a carrier" would use the Sprint network, but imposed no reciprocal obligation upon Sprint.

To effectuate the agreement, Sprint and Movistar needed to exchange lists of SIDs so that the numbers could be programmed into their respective PRLs (and then loaded onto their customers' handsets). To this end, they attached to the agreement schedules listing the BTAs in which each party was licensed and the corresponding SIDs that CIBERNET had assigned. Sprint's list contained well over 100 BTAs, whereas Movistar's contained only two. These schedules revealed, inter alia, two critically important facts: (1) Sprint was licensed to broadcast in San Juan and Mayaguez; and (2) Sprint had been assigned the 5142 SID (albeit designated by CIBERNET for the Virgin Islands).

Having executed the roaming agreement, Movistar's next step was to triage the Sprint information and load the data into its customers' handsets. This required the creation of a PRL, but Movistar had no expertise in that field. It decided to rely on the handset manufacturers to create the needed PRL and assigned one of its engineers, Pedro Sepúlveda, to oversee this operation. Sepúlveda, though, had no knowledge of the workings of a PRL.[3]

A handset manufacturer (Nokia) instructed Sepúlveda to get the relevant SID information from Sprint. Sepúlveda contacted

---

[3]Indeed, Sepúlveda confessed at the preliminary injunction hearing that he had no knowledge of the functions of an SID.

Sprint — which did not know either that Movistar lacked even the most elementary knowledge of how to design a PRL or that it planned to rely entirely on handset manufacturers in that regard — and Sprint agreed to give him a PRL containing all of its broadcasting information. This task fell to Robert Lamb, one of Sprint's in-house development analysts. When Lamb asked Sepúlveda for specifications, Sepúlveda gave him only one: Movistar's SID in San Juan (5205).

Lamb then constructed the program. As he had done in developing designs for many other roaming partners, he inserted into the PRL every SID that Sprint was broadcasting or planning to broadcast, dividing them into geo groups corresponding to the BTAs in which the SIDs would actually be used. Thinking that Movistar would want its customers to pick up a signal whenever one was available, he positioned Sprint for home-on-home roaming (just as he had always done in PRLs for other roaming partners). To that end, he placed the intended Sprint SID for Puerto Rico, 5142, in the Puerto Rico geo group.

Unbeknownst to Lamb, Movistar had decided to look elsewhere for home-on-home roaming. Within a few weeks of the time that Lamb forwarded the completed PRL to Sepúlveda — whether before or after is not clear from the record — Movistar entered into a home-on-home roaming agreement with Puerto Rico Telephone Company.

-8-

The record is pellucid that Movistar never informed Sprint of its decision to use another carrier for home-on-home roaming.

Lamb sent the completed PRL, labeled v930 (or version 930), to Sepúlveda on August 9, 1999. He attached a bit file containing the program itself and a text file delineating the contents of the program. We attach a copy of the pertinent portion of the text file as an appendix to this opinion.

Some elucidation of the text file may prove helpful. The second column from the left lists all the SIDs in order of geo group. The fifth column shows that every time the program encounters the term "new," it will know that it is entering a neoteric geo group. Finally, the column farthest on the right indicates whether or not the customer is roaming on another network.

Following this conventional praxis, Lamb programmed the PRL so that it would recognize Movistar's signal before all others when the subscriber was located in an area served by Movistar. To implement this decision, he placed the word "new" next to "5205" (indicating a new geo group) and the word "off" (indicating that the caller was not roaming). He placed the SID that Sprint planned to deploy in Puerto Rico — 5142 — directly below 5205 and in the same geo group, but with a lower preference. Thus, if a subscriber could not pick up the Movistar SID in Puerto Rico, he would hook into the Sprint SID if available (but the subscriber would then be

roaming and would be alerted to his roaming status). When Lamb forwarded these files to Sepúlveda, his transmittal note stated: "This should take care of all of your PRL troubles for a long time to come."

Sepúlveda sent the PRL to the handset manufacturers. Nokia loaded its telephones with the PRL, but the instruments did not function as expected. Sepúlveda asked one of Nokia's competitors, Qualcomm, for advice. A Qualcomm representative, Polo Aviles, scrutinized the PRL text file and spotted two potential glitches. First, Lamb had accidentally placed one of Centennial's SIDs (4176) in the wrong geo group, so that the PRL would lock into that SID before it located Movistar's SID. Second, Aviles questioned the placement of the 5142 SID inside the Puerto Rico geo group; he did not know to whom it belonged and he worried that it might cause problems in the future. Aviles discussed these matters with Sepúlveda and another Movistar official. He showed them how to read the PRL text file, but he did not make any changes to the PRL.

Movistar proceeded to tinker with the PRL. Someone other than Sprint — the record is obscure as to the identity of the person or persons — created at least four, and perhaps as many as seven, different versions of the PRL before settling on v937. The individual who designed v937 assumed that Sprint would broadcast its 5142 SID only in the Virgin Islands, and, therefore, placed

5142 in a geo group outside Puerto Rico.  Movistar never consulted Sprint about this decision, or, for that matter, about any other changes to Lamb's original PRL.

## C. **Sprint's Launch**.

On September 23, 1999, Movistar inaugurated its service. For a time, things went smoothly.  Sprint, meanwhile, continued with its plans to extend its network to Puerto Rico.  In February of 2001, Lamb (who now had the responsibility of choosing which SID to broadcast) noticed a potential problem with using 5142 in Puerto Rico:  this SID was not programmed into the PRLs of approximately one-sixth of the handsets carried by Sprint customers, and those customers (some 2,000,000 strong) would roam onto other networks if that SID were used in Puerto Rico.  Lamb initially proposed to solve this problem by substituting 4396 — an SID assigned to Sprint for the Cleveland BTA.

Sprint announced through an update issued in April of 2001 that it planned to use the 4396 SID in Puerto Rico.  That prospect never materialized, for when Sprint field-tested 4396 in Puerto Rico, Centennial and Movistar both complained.  As matters turned out, Sprint's use of 4396 in Puerto Rico proved likely to cause some of Centennial's and Movistar's customers to roam inadvertently onto the Sprint network even while on the island. Centennial expressed especial indignation because it had relied on

Sprint's earlier representations and blocked the 5142 signal on its handsets (but not 4396).

After discussing the situation with Centennial engineers, Lamb wrote a memorandum to his superiors. This communique, dated September 7, 2001, weighed the relative advantages and disadvantages of reverting to the original plan. In it, Lamb concluded that using 5142 would ameliorate the difficulties experienced by the other service providers but would force a great many Sprint subscribers to roam while in Puerto Rico unless updated PRLs were programed into their handsets.

Notwithstanding the inconvenience to its own customers and the concomitant loss of revenue when those customers roamed on other networks, Sprint opted to placate Centennial and Movistar. This decision led Sprint to revive its plan to broadcast on 5142 in Puerto Rico. On September 16, a Sprint executive called a Movistar hierarch, Claudio Hidalgo, and told him of this outcome. Hidalgo thanked the caller and expressed his belief that Sprint's use of the 5142 SID would solve Movistar's problems.

Sprint launched its service in Puerto Rico the next day.[4] While its use of 5142 satisfied Centennial's concerns, Movistar's troubles were only beginning. Because Movistar's PRL placed 5142 in a different (non-Puerto Rico) geo group, many of its customers'

---

[4]Sprint announced its decision to revert to the use of 5142 in an update issued on September 28, 2001.

handsets hooked onto that SID without first searching for Movistar's SID. Thus, although calling within Puerto Rico, these customers would roam on the Sprint network, accruing significantly higher charges than if they had accessed the Movistar network. On a single day in the first week of Sprint's launch, 166,080 calls placed by Movistar customers in Puerto Rico wound up on Sprint's network.

Movistar promptly informed Sprint of the difficulties that its customers were experiencing and requested that Sprint suspend use of the 5142 SID in Puerto Rico for six months so that Movistar could reprogram its customers' software. In exchange, Movistar offered to give Sprint subscribers sharply reduced roaming rates on its network. As an alternative solution, Movistar proposed that Sprint deploy an SID ostensibly assigned to Sprint for use in the Dominican Republic.[5]

Sprint flatly refused these entreaties. It had examined the situation in some depth before launching its Puerto Rico operation and had concluded that there was no feasible alternative to using 5142. It attempted to ameliorate the hardship to Movistar's clients who hooked into Sprint's Puerto Rico network by

---

[5]We say "ostensibly" because the record before us contains no materials showing either that Sprint holds a license to broadcast in that country or that it has been assigned an SID for use there.

-13-

funneling them to Movistar's service center for instructions on how to reprogram their handsets to block non-Movistar signals.[6]

Although the number of calls by Movistar users on the Sprint network dropped to approximately 2,000 per day within a month, Sprint's solution did not satisfy Movistar. Some handsets needed to be taken to a customer service center for reprogramming, and all Movistar customers wishing to roam on the mainland had to reprogram their handsets whenever they left Puerto Rico. This prevented Movistar from advertising that its service included "automatic roaming."

### D. **The Proceedings Below**.

On September 21, 2001, Movistar invoked diversity jurisdiction, 28 U.S.C. § 1332(a), and sued Sprint in the United States District Court for the District of Puerto Rico. It alleged that Sprint had tortiously interfered with the contractual relationship between Movistar and its subscribers, violated a good faith covenant contained in the roaming agreement, and otherwise behaved badly. To remedy these transgressions in the short run, Movistar sought an injunction barring Sprint from broadcasting the 5142 SID in Puerto Rico.

The matter first came before a district judge, who refused to issue a temporary restraining order. Thereafter, the

---

[6]Sprint also offered to charge discounted rates to Movistar customers roaming in Puerto Rico, but Movistar rejected this approach.

parties consented to proceed before a magistrate judge, see 28 U.S.C. § 636(c), who expedited discovery and scheduled an evidentiary hearing. The judge then heard four days of testimony on Movistar's request for a preliminary injunction. For the most part, the testimony was not conflicting, and the judge stated that he considered all the witnesses credible.

Roughly one week after the end of the hearing, the magistrate judge granted Movistar's prayer for a preliminary injunction. In his rescript, the judge found that Movistar was likely to succeed on both its tortious interference and breach of good faith claims; that Movistar faced irreparable harm due to the "injury to its image, goodwill and reputation before its clients as a result of Sprint's use of SID 5142"; that the harm that Sprint stood to suffer upon the issuance of an injunction deserved little weight because Sprint's actions had caused the predicament; and that an injunction was in the public interest.

Centennial reacted with dismay to news of the court's order. It had blocked the 5142 SID in anticipation of Sprint's launch in Puerto Rico and, if Sprint were forced to broadcast on a different (unblocked) SID, Centennial subscribers in Puerto Rico would wind up roaming on the Sprint network. In an effort to forestall this result, Centennial moved to intervene, see Fed. R. Civ. P. 24(a)(2), and to stay the preliminary injunction pending

appeal.  The court granted the motion to intervene, but refused the stay.

Sprint and Centennial both appealed from the issuance of the injunction.  We consolidated the appeals and expedited appellate proceedings.

## II.  ANALYSIS

Whether or not to issue a preliminary injunction depends upon four factors:  (1) the movant's probability of success on the merits, (2) the likelihood of irreparable harm absent preliminary injunctive relief, (3) a comparison between the harm to the movant if no injunction issues and the harm to the objectors if one does issue, and (4) how the granting or denial of an injunction will interact with the public interest.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996).  The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.  Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).

With this framework in mind, we examine the district court's conclusion that Movistar showed a likelihood of succeeding on its claims against Sprint.  Broadly speaking, our review is for abuse of discretion.  Ross-Simons, 102 F.3d at 16.  We are mindful, however, that this rubric does not impose a unitary standard. Rather, it demands that we scrutinize abstract legal matters de

novo, findings of fact for clear error, and judgment calls with considerable deference to the trier.  Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000).  We note, moreover, that this is a diversity case, so the substantive law of Puerto Rico controls.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Elliot v. S.D. Warren Co., 134 F.3d 1, 5 (1st Cir. 1998).

## A. **Likelihood of Success:  Tortious Interference**.

Movistar's allegations involve two different sets of contracts:  its subscriber contracts and its roaming agreement with Sprint.  Its principal claim focuses on the subscriber contracts. This claim is brought under 31 P.R. Laws Ann. § 5141, which provides in pertinent part that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done."

In General Office Products Corp. v. A.M. Capen's Sons, Inc., 115 P.R. Offic. Trans. 727, 734 (1984), the Supreme Court of Puerto Rico determined that this provision encompasses claims of tortious interference.  The court carefully circumscribed the resultant cause of action, requiring claimants to show (1) the existence of a contract between two or more parties, (2) interference with that contract by the defendant, (3) "fault" on the defendant's part, (4) damage to the plaintiff, and (5) a nexus between the plaintiff's fault and the defendant's damage.  Id. at 734-35.

-17-

The magistrate judge held that Movistar proved all of these elements. Pertinently, he found that Sprint was at fault because the schedules Sprint attached to the roaming agreement had "induced plaintiff to reasonably believe that SID 5142 was intended for the U.S. Virgin Islands," yet Sprint then proceeded to broadcast that signal in Puerto Rico. In making this "reliance" finding, the judge leaned heavily on the testimony of witnesses who had little to no involvement in the design of the successive versions of Movistar's PRL. Perhaps more troubling, the judge discounted the testimony of four knowledgeable witnesses — Lamb, Aviles, Weston Coffindaffer (a Sprint executive), and Miguel Palacios (a Centennial engineer) — each of whom noted that the version of the PRL prepared by Lamb (v930) placed the 5142 SID within the Puerto Rico geo group, and, accordingly, gave fair warning that 5142 would be broadcast in Puerto Rico. The judge did not question either the credibility of these witnesses or the authenticity of the trade usage that they described, but nonetheless dismissed their evidence on the ground that Movistar, as a neophyte in the industry, was entitled to special swaddling. The judge stated:

> Notwithstanding, the court does not consider said expert opinion of weight in this instance, given the fact that in 1999 [Movistar] entered the cellular telephone market in Puerto Rico, and did not have Sprint's technical expertise nor highly qualified personnel. As mentioned earlier,

> [Movistar] relied on Sprint to set up its
> initial PRL.

This rationale is insufficient to warrant an affirmative "likelihood of success" determination. Under Puerto Rico law, the "fault" element of tortious interference requires a stronger showing. In General Office Products, the Supreme Court of Puerto Rico indicated that, to be liable, a defendant must have "acted tortiously, with knowledge of the contract's existence." 115 P.R. Offic. Trans. at 734. The court recently elaborated on the scope of this requirement, explaining that the plaintiff must show that the defendant intended to interfere with the contract, knowing that this interference would cause injury to the plaintiff. Jusino Figueroa v. Walgreens of San Patricio Inc., 2001 TSPR 150, 2001 WL 1414693, at *5 (P.R. 2001). Thus, to ground liability the defendant's actions must at least evince a quasi-delictive intent. Id.

The magistrate judge's "likelihood of success" finding cannot be sustained under this criterion. As indicated above, the judge based his ruling on one piece of evidence: Movistar's supposed reliance on the schedules attached to the original roaming agreement. But even if Sprint bore some responsibility for that reliance — a doubtful proposition, given the unchallenged evidence of trade usage and Movistar's failure to ask Sprint to explain the schedules — the record is uncontradicted that Sprint called Movistar on the eve of the launch to inform it of the decision to

-19-

use 5142. Movistar told Sprint unequivocally that it was satisfied with that decision. Given this explicit statement and Movistar's acquiescence in Sprint's plan, the record simply cannot justify a finding that Sprint induced Movistar to believe that it (Sprint) would broadcast 5142 only in the Virgin Islands.

The only remaining question is whether Sprint somehow tricked Movistar into consenting to the plan despite knowing that the use of 5142 in Puerto Rico would disrupt Movistar's service. The proof plainly refutes this possibility. After all, Lamb had programmed the PRL so that 5142 would not interfere with Movistar's service — and if 5142 had remained in the Puerto Rico geo group (where Lamb had placed it), Movistar's subscribers would have hooked into that SID only when Movistar's signal was unavailable. The modification of the geo groups in Movistar's PRL is at the root of the problem — and there is absolutely no evidence that Sprint knew that Movistar had tinkered with the PRL at all, let alone that it had placed the 5142 SID in a totally different geo group.

To cinch matters, the remainder of the record is barren of any evidence of an intent to interfere with Movistar's subscriber contracts. Sprint's attentiveness to Movistar's (and Centennial's) complaints led it to abandon its plan to use the 4396 SID in Puerto Rico, and that attentiveness itself is significant evidence of Sprint's lack of improper intent. Sprint's ensuing decision to use 5142 in lieu of 4396 is equally persuasive evidence

that it had no intention of interfering with Movistar's subscriber contracts. By foregoing the use of an SID that had been preprogramed into all of its subscribers' handsets, Sprint assumed the burden of reprogramming approximately 2,000,000 instruments and forced many of its own customers to continue using the networks of its roaming partners when they traveled to Puerto Rico. We believe that this sacrifice amply demonstrates that Sprint had no ulterior motive in deciding to broadcast 5142 in Puerto Rico.

Movistar attempts to parry this thrust by pointing to other evidence. Specifically, it says that it informed Sprint shortly after Sprint's Puerto Rico launch that the 5142 SID was interfering with its service, but that Sprint nonetheless continued broadcasting on this SID. In Movistar's view, this proves that Sprint's decision to persist in broadcasting 5142 was made with knowledge that it would injure Movistar.

This asseveration lacks force. The magistrate judge predicated his finding on what transpired up to the time of Sprint's Puerto Rico launch, not on what transpired thereafter. And in all events, Sprint's conduct after learning of Movistar's plight, as depicted in the record before us, does not support a plausible inference that it intended to interfere with Movistar's subscriber contracts. When the problem surfaced, Sprint consulted promptly with Movistar on how to resolve it and immediately began diverting callers to Movistar's service center so that they could

stop unwanted roaming.  Sprint also offered to have Movistar's subscribers roam at sharply reduced rates until Movistar could reprogram its customers' handsets.  It was Movistar, not Sprint, that refused this seemingly reasonable compromise.  See supra note 6.

We summarize succinctly.  On the record as it stands, there is no adequate evidentiary basis for finding that Sprint either led Movistar to believe that 5142 would be broadcast only in the Virgin Islands or otherwise manifested an intent to interfere with Movistar's operations.  Hence, the magistrate judge's determination that Movistar was likely to succeed on its tortious interference claim is clearly erroneous.  See Cumpiano v. Banco Santander, 902 F.2d 148, 152 (1st Cir. 1990) (explaining that a finding is clearly erroneous if whole-record review produces "a strong, unyielding belief that a mistake has been made").

In light of this conclusion, the fate of the preliminary injunction hinges on the magistrate judge's alternative finding: that Movistar exhibited a likelihood of success on its claim that Sprint violated the covenant of good faith and fair dealing contained in the roaming agreement.  We turn next to that finding.

**B.  <u>Likelihood of Success:  Good Faith</u>**.

In adjudicating this issue, the magistrate judge drew heavily upon Article 14.3 of the roaming agreement, which provides:

> The Parties agree to use their respective best, diligent, and good faith efforts to

> fulfill all of their obligations under this Agreement. The Parties recognize, however, that to effectuate all the purposes of this Agreement, it may be necessary either to enter into future agreements or to amend this Agreement, or both. In that event, the Parties agree to negotiate with each other in good faith.

Extrapolating from this provision, the judge concluded, correctly in our view, that "Sprint's contemporaneous acts of entering into a roaming agreement with plaintiff and setting up plaintiff's PRL must both be governed by 'good faith' in dealing." The judge then went on to find that because "Sprint induced [Movistar] to reasonably understand that SID 5142 was intended for the U.S. Virgin Islands," it undertook a duty (which it breached) to refrain from adversely affecting Movistar's PRL by using 5142 in Puerto Rico. We concentrate our analysis on this finding.

The term "good faith," used here in respect to how the parties will effectuate the roaming agreement and how they will negotiate any ancillary agreements, has a particular meaning within the Puerto Rico Civil Code. See 31 P.R. Laws Ann. § 3375. That statute requires the parties to a contract to perform all aspects of the contract — in respect to the consequences as well as in respect to the terms — in good faith. Id. Writ large, that requirement serves "the commendable purpose of injecting ethical content into the legal order." Velilla v. Pueblo Supermarkets, Inc., 111 P.R. Offic. Trans. 732, 736 (1981). When one moves from the general to the specific, however, the ethical content of each

act must be examined in the light of its particular circumstances. Id. at 735-36.

In determining whether liability attaches in a particular instance, an inquiring court typically examines the totality of the circumstances. See Shelley v. Trafalgar House Pub. Ltd., 977 F. Supp. 95, 98 (D.P.R. 1997). Liability exists if, in light of all the surrounding circumstances, the party's actions appear arbitrary, deceitful, or animated by some improper purpose. See Velazquez Casillas v. Forest Labs., Inc., 90 F. Supp. 2d 161, 167 (D.P.R. 2000); Producciones Tommy Muñiz, Inc. v. COPAN, 113 P.R. Dec. 517, 526-27 (1982).

Against this backdrop, our inquiry reduces to whether the record, in its current, partially-developed state, evinces sufficient support for a finding that Sprint engaged in unethical behavior either while carrying out the terms of the roaming agreement or while addressing the problems that plagued Movistar after Sprint's Puerto Rico launch. This question demands a negative answer.

The key facts are not in dispute. When Lamb designed the PRL (v930), he conferred with Movistar's representative (Sepúlveda) to learn Movistar's specifications. Consistent with what he was told, he placed the Movistar SID ahead of Sprint's anticipated SID (5142) in the order of preference for the Puerto Rico geo group. This effectuated the parties' mutual intent by preventing

Movistar's customers from hooking into Sprint's signal so long as Movistar's signal was available. After completing this task, Lamb took pains to provide a text file along with the bit file so that persons acting in Movistar's interest would know both the content of the PRL and the placement of the components within it. Movistar thus received the benefit of its bargain.

Nor were Sprint's actions once it had delivered the PRL calculated to deprive Movistar of that benefit. When Sprint toyed with the notion of using 4396 in Puerto Rico, it prudently embarked on a field test. Discovering that 4396 caused problems for other service providers (including Movistar), Sprint responded by abandoning its plans to broadcast that signal in Puerto Rico. Forced to substitute a different SID, Sprint reverted to an alternative — 5142 — that seemingly put others' interests ahead of its own. To be on the safe side, it asked for, and explicitly received, clearance from the other service providers (Movistar included) before beginning to broadcast on 5142 .

We think that this evidence strongly preponderates against a conclusion that Sprint acted in bad faith. At the time of its Puerto Rico launch, it had absolutely no reason to believe that its switch from 4396 to 5142 would hinder, rather than help, Movistar's customers. After all, Movistar had expressly approved the switch, and, moreover, Sprint had no reason to believe that the PRL Lamb prepared (v930) had been altered in any material respect.

Had that PRL remained as originally programmed, the home-on-home roaming option would have permitted Movistar's customers to complete their calls on the Movistar network whenever and wherever Movistar's signal was available. What Sprint did have reason to believe was that, by using 5142, it would be acting to its own detriment. Nonetheless, it was willing to absorb this loss in order to avoid possible harm to its roaming partners. That is scarcely a badge of bad faith.

So too Sprint's actions after the launch. When it was presented with a windfall from unexpected Movistar roamers in Puerto Rico, Sprint acted expeditiously to stem the tide by shuttling those customers to Movistar's service center. It also offered to take other steps to palliate the problem, but could not do so because Movistar balked.

Evidence of "the direction of . . . negotiations" can be highly relevant in assessing good faith in contract cases. Shelley, 977 F. Supp. at 98. Here, that evidence tends to exonerate Sprint. Although Movistar may feel dissatisfied at this stage of the proceedings, it is surpassingly difficult to see how Sprint's negotiating posture, or its other post-launch actions, can give rise to a conclusion that it acted in bad faith.

In sum, the magistrate judge's determination that Sprint likely would be found to have acted in bad faith lacks an adequate evidentiary predicate (and, therefore, is clearly erroneous). See

McGuire v. Reilly, 260 F.3d 36, 45 (1st Cir. 2001). Accordingly, the district court erred in resting the preliminary injunction on this ground.

### C. **Other Theories**.

Movistar attempts to shore up the preliminary injunction on two additional bases. Arguing that its complaint gives rise to other statements of claim — Sprint's breach of an implied warranty in the v930 PRL and its negligence in deciding to broadcast the 5142 SID in Puerto Rico — Movistar posits that it is likely to succeed on these initiatives. The magistrate judge did not opine on either theory. Nor do we.

Injunctive relief is, by its very nature, fact-sensitive and case-specific. For that reason, the court of appeals ordinarily will not uphold a preliminary injunction on a ground that was not fully addressed by the trial court. See, e.g., TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir. 1996); Aoude v. Mobil Oil Corp., 862 F.2d 890, 895 (1st Cir. 1988); cf. Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1228 (1st Cir. 1994) (construing Fed. R. Civ. P. 52(a) to require district courts to make sufficiently detailed findings to permit informed appellate review).

To be sure, there will from time to time be exceptions — but those exceptions are likely to involve alternate theories that present abstract legal questions and, therefore, do not require

-27-

differential factfinding.  See, e.g., McGuire, 260 F.3d at 50 (addressing, and rejecting, an alternative ground that depended on a question of statutory interpretation).  Here, however, circumspection is especially appropriate.  To the extent that they are viable at all, the new theories are factbound.  Moreover, the intervenor (Centennial) joined the fray only after the magistrate judge had ruled, and so had no opportunity to present evidence or argument in the trial court.  In its filings, it has raised legitimate questions about the effect of an injunction on its customers — and we have every reason to believe that it can make a substantial contribution to the factfinding process.  Under the circumstances, we think that Movistar's other claims are better addressed, in the first instance, by the court below.

## III.  CONCLUSION

Because a showing of likelihood of success on the merits is essential to the issuance of a preliminary injunction, see Ross-Simons, 102 F.3d at 16; Weaver, 984 F.2d at 12, it would serve no useful purpose either to review the magistrate judge's other findings or to discuss how this case fits into the remaining three facets of the preliminary injunction framework.  It suffices to say that, absent a demonstrated likelihood of success on the issues considered below, the preliminary injunction must be vacated and the case remanded for further proceedings.

Although we need go no further, we remark the obvious: the attractiveness of a negotiated settlement is undeniable, and we commend earnest consideration of that course to all parties. It does not take a savant to recognize that this case is far better suited to practical resolution by businessmen familiar with the industry than by protracted litigation (which is bound to prove costly, inefficient, and time-consuming). Sprint can take only limited comfort in the ruling that we announce today. That ruling reflects our analysis of a partially-developed record (and, thus, is hardly definitive). It most assuredly does not impugn the possibility that Movistar may ultimately succeed on some or all of its claims once the evidence is fully developed. See Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991) (explaining that "a court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as [no more than] statements of probable outcomes"). Given the complexity of the technology, the multiplicity of interests involved, and the tangled nature of the case, anything is possible.

**Vacated and remanded**.

**APPENDIX**

`prl v930`

. . . .

System Table

_____

| no | sid | nid | neg_pref | geo | pri | acq_index | roam_ind |
|---|---|---|---|---|---|---|---|

| 0 | 16410 | 65535 | Preferred | New (0) | More (1) | 4 | On |
| 1 | 4106 | 65535 | Preferred | New (0) | Same (1) | 14 | On |

. . . .

| 20 | 484 | 65535 | Preferred | Same(1) | More (1) | 4 | On |
| 21 | 5205 | 65535 | Preferred | New (0) | More (1) | 22 | Off |
| 22 | 5142 | 65535 | Preferred | Same(1) | More (1) | 0 | On |
| 23 | 4145 | 65535 | Preferred | New (0) | Same (0) | 3 | On |

. . . .

| 252 | 32767 | 930 | Negative | New (0) | Same (0) | 26 | |