Orlando **ORTIZ–CHEVRES,**
et al., **Plaintiffs,**

v.

Ileana **ECHEGOYEN–SANTALLA,**
et al., **Defendants.**

No. CIV.02–2132 PG.

United States District Court,
D. Puerto Rico.

Aug. 20, 2002.

Fernando L. Gallardo, Woods and Woods, San Juan, PR, Charles A. Rodriguez, San Juan, PR, for Orlando Ortiz–Chevres, Lizbette Nieves–Quiles, Conjugal Partnership Ortiz–Nieves, plaintiffs.

Ildefonso Lopez–Morales, O'Neill & Borges, Hector Claudio, O'Neill & Borges, San Juan, PR, for Ileana Echegoyen–Santalla, Gabriel Alonso–Serra, defendants.

### OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

Before the Court is Plaintiff's Motion for Hearing for a Preliminary Injunction (Docket No. 2). Plaintiff filed a Verified Complaint (Docket No. 1) and a hearing was held on the matter of the preliminary injunction (Docket Nos. 11 and 12). For the reasons set forth below, the request for injunctive relief is **GRANTED**.

### INTRODUCTION

Plaintiff Orlando Ortiz–Chevres ("Ortiz" or "Plaintiff") requests a preliminary injunction to prevent the Secretary of the Department of Housing ("DH") of the Commonwealth of Puerto Rico, Ileana Echegoyen–Santalla ("Echegoyen" or "De-

fendant") and the Administrator of the DH, Gabriel Alonso–Serra ("Alonso" or "Defendant") from terminating his employment with the Community Revitalization Administration ("CRA"), an agency administered by the DH. Plaintiff filed this action on July 30, 2002 alleging that the decision to effectuate such termination was based on discriminatory animus against him on the basis of his political activity and conduct, and thus such decision violates his constitutional rights. Ortiz bases his claims on the First and Fourteenth Amendment of the U.S. Constitution, and 42 U.S.C. § 1983.

In his complaint Plaintiff requests a Temporary Restraining Order ("TRO"), a preliminary and permanent injunction, and compensatory and punitive damages, as relief for Defendants' alleged constitutional violations. On July 31, 2002 this Court granted Plaintiff's request for a TRO (Docket No. 3) and issued such TRO wherein it scheduled a hearing for August 9, 2002. The hearing took place within a span of three days, on August 9th, August 15th and finally August 19th, when Defendants presentation of their last witness brought the hearing to an end.

### FACTUAL BACKGROUND

*Ortiz' Career in Public Service*

Plaintiff Ortiz received a Bachelor's Degree in Business Administration from the Inter–American University of Puerto Rico in 1999 and is currently pursuing a Masters' Degree in Business Administration also from the Inter–American University.

Ortiz has been an active member of the New Progressive Party ("NPP") in Puerto Rico since 1994. (Pl.'s Verified Compl. at ¶ 7). He currently chairs the NPP's municipal committee in Naranjito, Puerto Rico. *Id.* On or about July or August 1999, Ortiz, announced his candidacy for the mayoral election in Naranjito that would take place during the month of November of the year 2000. (Def.'s Opp'n Mem. at 2–3). He lost that election to Naranjito's current mayor, the Honorable Manuel de J. Ortega ("Mayor Ortega"). In March 2002 he announced that he would once again run for mayor of Naranjito in the 2004 elections. (Pl.'s Verified Compl. at ¶ 7).

Prior to obtaining his bachelor's degree, Ortiz began working on November 1998 as an Assistant Accountant I for the DH at its regional office in Bayamón. (Pl.'s Verified Compl. at ¶ 7, and Def.'s Opp'n Mem. at 2). The following year he became a career employee at the DH. (Pl.'s Verified Compl. at ¶ 8). On October 1999, Ortiz applied for an Executive Official I position with the Community Revitalization Administration ("CRA"), regional office of Naranjito. The application process included filling out an application, successfully completing an examination, and participating in one or more job interviews. If given to him, this position would make Ortiz the CRA's Principal and/or Chief Officer within region that would be covered by the Naranjito office. (Pl.'s Verified Compl. at ¶ 7, and Def.'s Opp'n Mem. at 2). Mr. Ortiz would be the first to hold this position at the CRA office in Naranjito which he, together with three other employees, eventually opened soon after March 1, 2000, the day he was hired for the position. The other three employees were María de Lourdes Martínez (community guidance counseling coordinator), Ednisomalis Rivera Torres (office clerk), and Irma Diaz (maintenance employee).

Ortiz' duties at the CRA included the administration and supervision of the Naranjito regional office, offering services to communities according to their particular needs, communicating with the community residents, referring of community residents to other government agencies, and orientation to the community, among oth-

ers. (Def.'s Opp'n Mem. at 3). A year after he took the position, Ortiz performance at the CRA office was considered to be excellent as noted in an evaluation dated July 31, 2001. (Pl.'s Ex. 20).

On August 17, 2000, Ortiz requested an unpaid leave of absence in order to "dedicate, day and night, to promote his candidacy in the mayoral election." (Pl's Ex. 1). Ortiz' request for unpaid leave of absence, however, was denied by the CRA. (Pl's Ex. 2). A special assistant to co-defendant Alonso, Mayra Matos Beltrán ("Matos"), stated in a memorandum that Section 11.4 of the agency regulations prohibited Ortiz from taking an unpaid leave of absence for purposes of promoting his candidacy for mayor. *Id.* In view of the foregoing, Matos recommended Ortiz to take vacation leave, instead of an unpaid leave of absence, until the date of the election on November 7, 2000. *Id.* As a result, Ortiz requested a vacation leave from September 5, 2000 to October 6, 2000.

Around the time that Ortiz was expected back at the CRA office in October he Ortiz began suffering back pains, emotional pressures and headaches. He went to see his doctor, Dr. Miguel A. Nova, who recommended that he rested for about a month from October 6, 2000 to November 10, 2000, and prepared a medical certificate to that effect for Ortiz to take to his employer. (Pl's Ex. 4). In accordance with his doctor's recommendation, Ortiz requested sick leave, which was granted, from October 6, 2000 to November 10, 2000. (Ex. C to Pl's Verified Compl.).

The CRA offices in Naranjito were leased form the Administration of Agropecuarian Development and Services ("ASDA"). (Def.'s Opp'n Mem. at 3 and Exs. to Def.'s Opp'n Mem. E, F and G). Almost a year after the 2000 elections, ASDA sent a letter to co-defendant Alonso requesting the CRA to vacate ASDA's facilities in Naranjito. The request resulted from an administrative reorganization of ASDA over which CRA had no control. (Ex. E to Pl's Verified Compl.). CRA was eventually forced to vacate ASDA's property on Naranjito on January 16, 2002. (Pl.'s Verified Compl. at ¶8 and Def.'s Opp'n Mem. at 5). Since ASDA forced the CRA to vacate its facilities in Naranjito, the agency was also forced to transfer Ortiz to another regional office in Bayamón, Puerto Rico, where he now remains employed.

*Investigation*

The investigation that led the DH to make the decision to terminate Ortiz was launched as a result of a letter sent on February 16, 2001 by the newly elected mayor of Naranjito, Mayor Ortega, to the Secretary of the DH, co-defendant Echegoyen. In that letter he alleged that the CRA's regional office in Naranjito had been improperly administered during the mayoral elections. (Pl.'s Ex. 5). Mr. Ortega stated in his letter that the regional office was used as a political instrument by Ortiz for his campaign during election time, and that Ortiz had been actively involved in political activities during his sick leave. *Id.*

Almost a year after the DH received this letter from Mayor Ortega, it asked Ms. Lora Jean Espada Medina ("Espada"), an attorney who has concentrated most of her career working in the labor and employment field, to undertake an investigation with regards to Ortiz's employment at the CRA office in Naranjito from March 2000 to January 2002. Espada has a contract with the DH pursuant to which she conducts employment related investigations regarding employees of either the DH or any government agency that falls under the DH.

The scope of the investigation was established by the first notice of hearing that was sent to Ortiz by Espada in which it

was stated that this investigative hearing was in reference to: (1) investigation of request, concession and use of a sick leave license; and (2) use of property and equipment belonging to the DH for personal or prohibited purposes. (Def.'s Ex. A). Exactly the same language was used in the caption of the citation for a second hearing before examining officer Juan Vargas Ferrer ("Ferrer"), (Def.'s Ex. B) and in the notice of resolution where Ortiz was ultimately informed of the DH's decision to discharge him. (Pl.'s Ex. 7).

Espada began her investigation by gathering some documents which were provided to her by the DH, such as Ortiz' personnel file and the letter sent by Mayor Ortega to Echegoyen. She then met with Ortiz at the above-mentioned investigative hearing, which lasted approximately thirty (30) minutes to an hour. She also met with María de Lourdes Martínez at another investigative hearing but did not meet with or talked to either Ednisomalis Rivera Torres or Irma Díaz. Espada contacted by phone but did not meet with Mayor Ortega. Finally, she also talked to Sara García, the supervisor who signed the July 31, 2001 performance review (Pl.'s Ex. 20) and who often served as liaison between Ortiz and the CRA's and DH's administrators. Espada did not contact or meet with anyone else in relation to her investigation.

Based on the information gathered from these sources, Espada prepared a twenty page single space memorandum where she made seventy-five (75) findings of fact and concluded that during the mayoral election of Naranjito, Ortiz engaged in several violations of the DH's and CRA's regulations including: 1) the use of his official position for politico-partisan purposes not consistent with the public service; 2) that he furnished services or carried out functions which entailed conflicts of interest with his obligations as public employee; 3) improper conduct in and outside the workplace (engaging in a quarrel with the members of the PDP); 4) dishonesty-with regard to his sick leave request; 5) improper use of his sick leave; 6) intentional refusal to notify the agency about its intention to run for mayor; and others. (Def.'s Opp'n Mem. at 6–7 and Def.'s Ex. E at 15–17).

On April 4, 2002, Ortiz was notified of a second hearing to be held on April 9, 2002 before an examination officer based on the findings of the investigation conducted by Espada. That notice included allegations which were literally taken from the report that had been prepared by Espada, a copy which was not made available to Ortiz at that time. Ortiz was not given a copy of the Espada report for him to keep at either hearing and it was not until July 30, 2002, that a copy was sent to him in the mail. (Def.'s Ex. C). The examination officer, Ferrer, did not conduct an independent investigation but instead limited his inquisition of the issues he had to decide upon to a review of the report that Espada had prepared and an interrogation made to Plaintiff on the day of the hearing. Based on the three and a half hour long hearing, Espada's report, and several documents submitted by Ortiz after the hearing which included performance evaluations he had received from his supervisors and copies of the inventory of equipment at the CRA's office in Naranjito, Ferrer agreed with Espada conclusions and recommended to the DH that Ortiz should be terminated. (Def.'s Ex. F). The DH chose to follow this recommendation and in a memorandum dated July 23, 2002, it informed Ortiz of its decision. As a result of the TRO issued by this Court on July 31, 2001, at this time Plaintiff still remains employed by the CRA.

## DISCUSSION

As suggested above, Plaintiff alleges that he was deprived of his First and

Fourteenth Amendment rights to freedom of speech and association and his rights to due process. He seeks redress for the alleged violations pursuant to 42 U.S.C. § 1983.

Defendant opposes Plaintiff's request for injunctive relief by arguing that the four-part test for ascertaining whether a preliminary injunction should be granted has not been complied with by the Plaintiff. Moreover, Defendants argue that they are entitled to qualified immunity, that the remedy Plaintiff's request is barred by the Eleventh Amendment as retroactive and that reinstatement should not be issued in cases such as this where the relief would be compensatory in nature.[1]

## PRELIMINARY INJUNCTION STANDARD

The standard for issuing a preliminary injunction is the often quoted four factor test: (1) the movant's probability of success on the merits, (2) the likelihood of irreparable harm absent preliminary injunctive relief, (3) a comparison between the harm to the movant if no injunction issues and the harm to the objectors if one does issue, and (4) how the granting or denial of an injunction will interact with the public interest. *New Comm Wireless Services, Inc. v. SprintCom, Inc.* 287 F.3d 1 (1st Cir.2002); *see also Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir.1996). The First Circuit has placed much emphasis on the importance of the first of these four factors, the likelihood of success on the merits. *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.

1993); *see also Morales–Narvaez v. Roselló,* 852 F.Supp. 104, 107 (D.P.R.1994).

*Probability of Success on the Merits*

### First Amendment

■ The First Amendment forbids government officials from discharging, promoting, transferring, recalling, or hiring public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved.[2] *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 73–76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574(1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). *Morales–Narvaez,* 852 F.Supp. at 108. In *Elrod* Justice Brennan emphasized that the right to associate with the political party of one's choice was a basic constitutional freedom. *Elrod,* 427 U.S. at 356, 96 S.Ct. 2673.

In more general terms, a government cannot take an adverse employment action or discriminate against an employee on the basis of that employee's political affiliations and beliefs or the employee's advocacy of political ideas. *Padilla–García v. Guillermo Rodríguez,* 212 F.3d 69, 75 (1st Cir.2000); *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 55 (1st Cir.1990). The Supreme Court explained in *Rutan* that the government simply cannot interfere with its employees' freedom to believe and associate, or to not believe and not associate. 497 U.S. at 75–76, 110 S.Ct. 2729. Moreover, the Court explained that what the First Amendment precludes a

---

1. These latter arguments were not made at the hearing. At this time, we are not persuaded by these arguments as presented in Defendants' opposition papers and we focus our attention on the elements necessary for injunctive relief and the need for immediate relief pending resolution on the merits of the case.

2. Since Defendants have not argued that party affiliation is a requirement or an appropriate requirement for the position from which Ortiz was terminated, we need not go into this exception to prohibited politically motivated discharges.

government from commanding directly, it also precludes a government from commanding indirectly. *Id.* at 77–79, 110 S.Ct. 2729. This becomes very significant in cases such as the instant one where the DH's conclusions in deciding to terminate Plaintiff suggests that in retrospect, to avoid any misconduct on his part, Ortiz would have had to choose between pursuing a career in public service with the CRA *or* maintaining, sponsoring and promoting his political beliefs and affiliations.

The U.S. Supreme Court has established a two-part burden-shifting analysis for evaluating First Amendment claims, which has also been applied in the political discrimination context. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see also Rodriguez–Rios v. Cordero,* 138 F.3d 22, 24 (1st Cir. 1998); *Acevedo–Diaz v. Aponte,* 1 F.3d 62, 67 (1st Cir.1993). The first prong of the analysis requires the plaintiff to show that she engaged in constitutionally protected conduct, and that this conduct was a substantial or motivating factor for the adverse employment decision. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568; *see also Padilla–Garcia,* 212 F.3d at 74. A Plaintiff has to establish a causal connection linking Defendants' conduct to his/her political activity. *Correa–Martinez,* 903 F.2d at 58. Once this has been established as a prima facie case, the defendant is given the opportunity to rebut it by establishing that it would have taken the same action regardless of the plaintiff's political beliefs. *Id.*

In this case, it is clear that Ortiz participated in protected activity, and he, as well as Defendants, introduced evidence at the preliminary injunction hearing tending to show that his political conduct was a substantial or motivating factor in the decision to discharge him. This evidence is enough for it to be likely that Ortiz could succeed on the merits of his claims.

In *Correa–Martinez,* the First Circuit found that support for a political candidate is an example of an association that inevitably implicates the "right 'to engage in association for the advancement of beliefs and ideas.'" 903 F.2d at 57(*quoting NAACP v. Button,* 371 U.S. 415, 429–30, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Ortiz has been an active member of the NPP political party since 1994, and has presided over that party's municipal committee in Naranjito for quite some time. Moreover, Ortiz himself has been the political candidate in this case and thus, his First Amendment rights are almost automatically implicated.

Having established Ortiz' constitutionally protected activity, to make an accurate determination of the likelihood of Plaintiff's success on the merits, we must now focus on whether Ortiz has shown that the decision to terminate him was politically motivated by establishing a causal connection between his political conduct as an active member of the NPP and his discharge.

In this case, what began as an investigation—initially stimulated by the triumphant candidate against whom Plaintiff lost Naranjito's mayoral elections—for an alleged dishonest request and misuse of a sick leave license, and the misuse of the CRA's property and equipment, turned into a self-created forum for the chosen investigator to voice out her concerns regarding the confusion to the voting population and the conflicts of interest that can be created by those who chose to work in public service and simultaneously run for an elected public officer government position.

Defendants list six (6) reasons, to justify their decision to terminate Plaintiff's employment at the CRA. (*See* P. 8 above;

Def.'s Opp'n Mem. at 6–7). However, not only does the record of this case together with the evidence presented at the preliminary injunction hearing fail to corroborate Defendant's proffered reasons for Ortiz' termination, but they also suggest that there was political motivation behind his termination.

It is evident from the record of this case and from the testimony heard at the preliminary injunction hearing that the decision to terminate Ortiz was primarily based on the report prepared by Espada. (Def.'s Ex. E). Examining officer Ferrer, who made the final recommendation, did not take into consideration anything else besides Espada's report and the testimony he obtained from Ortiz during the April 9, 2002 hearing. Nevertheless, no evidence was presented at the preliminary injunction hearing that corroborated or substantiated most if not all of the findings Espada makes in such report. In their opposition papers, Defendants contend that "[t]he agency's investigation corroborated the allegations made by Ortega" in his February 2001 letter. (Def.'s Opp'n Mem. at 6). However, the testimony of Espada at the preliminary injunction hearing proved exactly the opposite. No corroboration was obtained to the allegations that were made by Ortega in his letter and Espada did not even attempt to obtain a sworn statement from him. Espada testified that throughout her investigation she was *unable* to corroborate Mayor Ortega's allegations accusing Ortiz of conducting his political campaign from the CRA office or using CRA property and equipment for personal or prohibited purposes. Yet, this being one of the two issues that formed the basis of her investigation, she included it in her report as one of the main reasons justifying her recommendation to terminate Ortiz. Espada's support for the allegation that Ortiz dishonestly requested sick leave and thereafter misused his sick leave once it

was granted, was *solely* her own intuitions that Ortiz was lying to her. She was unable to obtain any proof or corroborating evidence for this allegation. Basically, without supporting or attempting to support her beliefs in any way, Espada was content to testify that she believed Ortiz was lying with regards to the request for sick leave, that she also believed there. was a conflict of interest between the position that Ortiz held at the CRA and his candidacy for public office, and that she had no basis for either of these beliefs, beliefs which form the sole foundation for her recommendation to terminate Ortiz, other than her own intuitive cognition.

On the other hand, the following evidence was introduced at the preliminary injunction hearing that suggests that Ortiz' termination was politically motivated: first, the investigation that eventually led to his termination was solely triggered by the February 16, 2001 letter sent by Mayor Ortega, a member of the Popular Democratic Party ("PDP"), which is the NPP's mayor opposing political party in Puerto Rico. Interestingly enough, Ortega's letter remained uncorroborated for almost a year—a year during which Ortiz received excellent evaluations—and it was not until the beginning of the year 2002 when the DH decided to conduct an investigation. Defendants offered no explanation for the delay in conducting the investigation. This leads us to a second factor which is that along with the timing of the investigation, the timing of the decision to terminate Ortiz is also suggestive. This investigation began around the same time that Ortiz officially announced his intention to run for mayor of Naranjito in the upcoming 2004 elections. Indeed, the citation for an official hearing with an examination officer, Mr. Juan Ferrer Vargas ("Ferrer"), was issued ten (10) days after Ortiz officially announced his intention to run for mayor and to remain as chairman of

NPP's municipal committee in Naranjito. Third, without highlighting its significance, we cannot ignore the fact that the only person who actually looked and examined first-hand the accusations that led to Ortiz termination was a member of the main rival political party to the NPP, the PDP, which also runs the current administration of the Commonwealth of Puerto Rico and thus employs both co-defendant Echegoyen and co-defendant Alonso. Ferrer on the other hand is a member of the NPP. *See Padilla–García*, 212 F.3d at 75. (political association's constitutionally protected status is not altered by the fact that person with whom public employee associated and person who allegedly retaliated against the employee for that association are members of different factions within the same political party). Finally, it is our understanding that in adopting Espada's conclusions and embracing and executing her recommendations, Defendants admit that it was Plaintiff's political activities that motivated their decision to terminate him because of the *potential* conflicts with the performance of his job.[3] Moreover, it is also our understanding that since the evidence introduced shows that the original subject matter of the investigation proved to be unfounded, Plaintiff's political affiliations and activities must have been a substantial factor in the decision to terminate him.

### Due Process

A career employee in Puerto Rico has a constitutionally protected property interest in continued employment. *Morales–Narvaez*, 852 F.Supp. at 112; *see also Rivera–Ruiz v. Gonzalez–Rivera*, 983 F.2d 332 (1st Cir.1993). Career employees can only be fired for good cause and before being discharged, they are entitled, pursuant to due process protections, to a pretermination hearing. *Morales–Narvaez*, 852 F.Supp. at 113; *see also Kauffman v. Puerto Rico Telephone Co.*, 841 F.2d 1169, 1173 (1st Cir.1988); *Maldonado Agueda v. Montalvo*, 826 F.Supp. 47 (D.P.R.1993), (*citing Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 538–47, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)).

We find that Plaintiff could possibly succeed on the merits of his due process claim due to the fact that the inquiries and the findings that were made by Espada and Ferrer went beyond the issues that were notified to Ortiz as the bases of the investigation he was being subjected to. An investigation that initially was limited to two issues resulted in a full blown inquiry into issues that ranged from the creation of the Naranjito CRA office to potential conflicts between holding a position which entails certain services to the community and running for public office, as well as a twenty (20) page report full of unsupported conclusions. (Def.'s Ex. E). Espada's investigation and the hearings that resulted from such investigation were suspect and faulty in other ways. For example, Espada was asked to make a recommendation with regards to an employee who no longer held the position he had when the allegations which formed the basis of her investigation took place. However, it was not until she interviewed María de Lourdes Martínez, which occurred after she interviewed Ortiz, that she became aware of the fact that the CRA office in Naranjito office had been closed and that this was the reason why Ortiz was no longer at his previously held position. Moreover, without being provided a copy of Espada's twenty (20) page report during the two (2) months between the date when Espada completed it and the date of the

---

**3.** We distinguish *potential* from *actual* conflict, since no evidence of any actual conflict has been presented to the Court.

hearing, he was summoned to appear before an examination officer and defend seventy-five (75) factual findings and five (5) pages of conclusions of law, that as we have explained before, were unsupported and found no basis or foundation in fact within the evidence gathered by Defendants which was then introduced at the preliminary injunction hearing.

*Potential for Irreparable Injury & Balance of Equities*

Out of the six (6) reasons Defendants put forth to justify Plaintiff's termination (*See* Def.'s Opp'n Mem. at 6–7), four (4) remained fully unsupported: 1) misuse of office property and equipment for personal and prohibited purposes, 2) improper use of and 3) dishonesty with regards to his sick leave request, and 4) refusal to notify the agency of his intention to run for mayor. The Court has no reason to believe Plaintiff will engage in any conduct resembling these allegations as a continuing employee of the CRA in Bayamón.

As to the remaining two reasons, the misuse of his position for political purposes and the conflict of interest between his official position with the CRA and his candidacy for mayor, we find that even if Defendants prove this to be true at trial, there is no longer a possibility of reoccurrence and/or a present threat to Defendants, due to the fact that Plaintiff is now employed in the Bayamón. Defendants presented no evidence at the preliminary injunction hearing that either of these incidents of misconduct are certain or even likely to occur in the future specially in light of the fact that Ortiz is no longer working strictly in the communities of Naranjito, the municipality where he intends to run for mayor. In fact, according to Ortiz' testimony, he now works with two (2) public housing projects in Bayamón, two (2) in Toa Baja, and two (2) in Toa Alta. Thus, the conflict of interests that so much troubled Espada, and presumably the DH when it decided to adopt her findings and follow her recommendations, are no longer present. Altogether, Defendants have failed to provide evidence of Ortiz' alleged misconduct as an employee of the CRA and the present or potential hardship to them as a result of this conduct. On the other hand, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute irreparable injury." *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir.1987). Therefore, we find that the second and third factors of the four-prong test weigh considerably in favor of issuance of an injunction.

*Effect on Public Interest*

Defendants did not proffer any evidence that showed the potential harm to the public interest that would result if this Court issued a preliminary injunction. Moreover, Defendants were not able to produce evidence at the preliminary injunction hearing that showed Ortiz' political activism conflicted with his duties as a public servant in Naranjito and much less that the conflict can still persist now that Ortiz is working primarily in the municipality of Bayamón. Indeed, Ortiz testified at the hearing that his inclination to be on leave during the two (2) months before the elections in 2000 was in part motivated by his concern that his job and his campaign could in any way encounter each other during those months or be perceived as related endeavors. Given the evidence that has been introduced in this case, we can only conclude that Ortiz's continued employment at the CRA will uphold "the interest of the state in preserving a body of skilled, competent and objective civil servicemen" that so much concerned Defendants. (Def.'s Opp'n Mem. at 12–13.)

### CONCLUSION

Upon considering these four factors pertinent to a request for preliminary injunc-

222

tive relief, we find that in this case interim relief is warranted and hereby **GRANT** Plaintiff's request for an injunction. Defendants, their agents, or anyone acting in concert with them or pursuant to their orders, and/or their successors in any representative capacity, are hereby ordered to refrain from terminating Plaintiff from his current employment at the CRA's office in Bayamón, Puerto Rico, and from engaging in any actions that may constitute an adverse employment action against Plaintiff in violation of his constitutional rights to free speech and association, and due process. The Court will in due process set a hearing on the request for a permanent injunction and for the assessment of damages.

**IT IS SO ORDERED.**