**AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, Plaintiff**

v.

**Kevin CONCANNON, Commissioner, Maine Department of Human Services, Defendant**

No. 02–CV–115–B–S.

United States District Court, D. Maine.

Aug. 19, 2002.

---

Catherine R. Connors, Daniel M. Snow, Clifford Ruprecht, Esq., Pierce, Atwood, Portland, ME, David J. Farber, Esq., Patton, Boggs & Blow, Washington, DC, for American Society of Consultant Pharmacists, plaintiff.

Jerrol A. Crouter, Brian D. Willing, Esq., Drummond, Woodsum & Macmahon, Portland, ME, Doris A. Harnett, Assistant Attorney General, Augusta, ME, Thomas H. Lawrence, Esq., Lawrence & Russel, LLP, Memphis, TN, G. Steven Rowe, Esq., Attorney General, Office of the Attorney General, Augusta, ME, for State of Maine Department of Human Services, defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, District Judge.

An organization representing pharmacists sued the Maine Department of Human Services (DHS), alleging that DHS violated federal Medicaid law and state administrative procedure when it imposed an emergency rule reducing reimbursement rates for prescription drugs. Presently before the Court is Plaintiff's Motion for Preliminary Injunction (Docket # 13). Having held an evidentiary hearing August 6, 2002, the Court makes the following findings of fact and conclusions of law, and DENIES the Motion.

## I. FINDINGS OF FACT

On July 1, 2002, Defendant DHS issued an "emergency rule" reducing the rate at which pharmacists participating in Maine's Medicaid program (known as "Maine-Care") were reimbursed for filling prescriptions for Medicaid-eligible customers.

Before DHS issued the rule, it paid pharmacists an amount equaling the "Average Wholesale Price" (AWP) (an industry-standard price) of drugs minus ten percent, plus a $3.35 "dispensing fee" for each prescription filled. The new rule augmented the discount on AWP to thirteen percent. Plaintiff American Society of Consultant Pharmacists (ASCP), a trade organization representing pharmacists in Maine, sued to enjoin the emergency rate reduction, arguing that its members had not received adequate notice or opportunity to comment on it, and that the rate was substantively infirm.

DHS implemented the rate change in response to Maine's current fiscal crisis. In late April 2002, Maine budget and treasury officials concluded that the State's income tax revenues for the 2001 tax year had fallen well short of anticipated levels, resulting in a projected budget deficit of roughly $170 million by the end of fiscal year 2003. Maine Governor Angus King responded by instructing state agencies to pare their FY 2003 budgets by two percent. DHS achieved this goal by proposing cuts in funding for a variety of health care services, including the AWP rate cut.

The Maine Bureau of Medical Services (BMS), the division of DHS responsible for administering MaineCare, was instrumental in formulating the AWP cut. It weighed a number of budget reduction measures before settling on the AWP rate cut, which it determined would do the least harm to Medicaid recipients' access to and quality of Medicaid services. In coming to this conclusion, BMS took into account several studies that indicated that the old AWP rate was above the national average and could be reduced without significant detriment to the Maine pharmaceutical industry. It also consulted the Maine legislature.

ASCP member pharmacists received little warning of the cut. On Saturday, June 29, and Sunday, June 30, 2002, a notice appeared in newspapers serving the areas of Bangor, Maine, and Portland, Maine, advertising the implementation of the new AWP rate as of July 1, 2002. It also announced the rulemaking to implement the rule permanently, the notice and comment period for which commenced the same day.

Nearly every pharmacist in Maine fills prescriptions for Medicaid recipients, who may be either "walk-in" customers, or residents of nursing facilities. Large, national chain pharmacies typically serve only the former. Smaller, independent pharmacies may serve only one type of customer, or both. Those that serve nursing home residents do so either at the request of a particular customer, or by contracting with a nursing home to be the default prescription-filler for all of its residents who do not have a preference for a specific pharmacist. Regardless of whether the pharmacists' Medicaid customers are walk-ins or nursing home residents, DHS reimburses all Medicaid participating pharmacists at the same rate for their prescription-filling services.

ASCP filed its suit on July 16, 2002, asserting a cause of action pursuant to 42 U.S.C. § 1983. The Court (Carter, J.) issued a temporary restraining order enjoining enforcement of the rate cut on July 29, 2002, and ASCP moved to convert the TRO to a preliminary injunction. The Court (Singal, J.) declined to extend the TRO when it expired on August 8, treating ASCP's motion as one for preliminary injunction (Docket # 17).[1]

1. Despite the present litigation, DHS has moved forward with a concurrent notice and comment rulemaking to implement the rate reduction permanently, and expects to issue a

## II. DISCUSSION

■ To be entitled to a preliminary injunction, Plaintiff must demonstrate that (1) it will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm that granting injunctive relief would inflict on the Defendant; (3) it has exhibited a likelihood of success on the merits; and (4) the public interest will not be adversely affected by the granting of the injunction. *See Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981); *Merrill Lynch v. Bennert,* 980 F.Supp. 73, 74 (D.Me.1997). The third factor sets a threshold. *See New Comm Wireless Servs. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir.2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity"). Fundamental to success on the merits is existence of a cause of action. Plaintiff asserts a cause of action pursuant to 42 U.S.C. § 1983 for violation of two sections of 42 U.S.C. § 1396a. It is not obvious that *any* plaintiff would have a Section 1983 action to enforce these sections, and therefore the Court begins its analysis with that inquiry.

### A. Existence of a Cause of Action

#### 1. Overview of Medicaid Statute

In 1965, Congress enacted Title XIX of the Social Security Act establishing the federal Medicaid program, which aimed to provide health care to needy individuals. Title XIX is a so-called "funding statute," by which Congress allocates federal funds to states in exchange for their participation in a federal program. *See general-*

*ly Harris v. McRae,* 448 U.S. 297, 308, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). States are not required to participate in Medicaid. However, if they wish to receive funding, they must formulate a plan that is consistent with Title XIX and submit it to the federal Department of Health and Human Services (DHHS) for approval. *See* 42 U.S.C. § 1302; 42 C.F.R. § 430.10 (2001).

The requirements that a state Medicaid plan must meet to obtain DHHS approval are listed at 42 U.S.C. § 1396a. Among them are the two provisions at issue in this case: § 1396a(a)(13)(A) and § 1396a(a)(30)(A). Together, Sections 13(A) and 30(A) mandate a procedural scheme by which states may set and make changes to Medicaid reimbursement rates, and the substantive criteria for those rates. Section 13(A) requires that a state plan provide

> for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which . . .
>
> > (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies and justifications . . .

42 U.S.C. § 1396a(a)(13)(A)(ii). Section 30(A) further requires that a state plan provide

> for such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy and quality of care, and are sufficient to enlist enough

---

rule sometime in the fall of 2002. ASCP anticipates challenging that rule in court as

well.

providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area...

*Id.* at 30(A).

### 2. Cause of Action Under 42 U.S.C. § 1983

If at any time a state plan fails to conform to statutory or regulatory requirements, DHHS may revoke the plan's federal funding. 42 U.S.C. § 1396c. Although Title XIX does not provide explicitly for private enforcement, Plaintiff claims that an alternative method of enforcing the Medicaid statute's requirements is via a private civil action pursuant to 42 U.S.C. § 1983.

A cause of action is available under Section 1983 for the deprivation of any rights, privileges or immunities secured by the Constitution and laws of the United States. *See Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). "In order to seek redress under Section 1983, a plaintiff must assert the violation of a federal right, and not merely a violation of a federal law." *Pa. Pharmacists Ass'n v. Houstoun,* 283 F.3d 531, 535 (3rd Cir.2002) (citing *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989)). A plaintiff can only succeed in such an action if "1) the statute creates 'enforceable rights, privileges or immunities within the meaning of section 1983' and 2) Congress has not 'foreclosed such enforcement of the statute in the enactment itself.'" *Id.* (citing *Wright v. Roanoke Redevelopment &*

*Housing Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)).

In *Gonzaga Univ. v. Doe,* ── U.S. ──, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), the Supreme Court elucidated the requirements for finding a right enforceable pursuant to Section 1983. Departing from earlier "multi-factor balancing tests" that allowed courts to "pick and choose which federal requirements may be enforced" via section 1983, the Court held that the proper inquiry was no different from the inquiry in its "implied right of action" cases.[2] Under the "implied right of action" doctrine, a plaintiff may not sue for the violation of a federal law unless "Congress intended to confer individual rights upon a class of beneficiaries." *Id.* at 2276 (citing *Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)); *Cannon v. Univ. of Chicago,* 441 U.S. 677, 689, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("the threshold question ... is whether the statute was enacted for the benefit of a special class of which plaintiff is a member"). Likewise under Section 1983, "it is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced...." *Id.* at 2275.

*Gonzaga* further held that courts could discern whether Congress "intended" to create a right by examining the text and structure of the particular statute. *Id.* at 2277. "[T]ext ... phrased in terms of the persons benefited," rather than in terms of "institutional policy and practice," indicates an intent to create a right in the identified individuals. *Id.* at 2275, 2278. For example, "individually focused termi-

---

2. The "multi-factor" test the Court referred to is the three-factor test discussed in *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), under which courts considered (1) whether Congress intended the statutory provision to benefit the plaintiff; (2) whether the right that the plaintiff alleged the statute protected was too "vague and amorphous" for courts to know how to enforce it; and (3) whether the statute was binding upon the states, by virtue of being phrased in mandatory terms. *See also Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

nology," such as the Civil Rights Act of 1964's admonition that "no person shall be subjected to discrimination," is such "rights-creating" language. *Id.* at 2276; *Sandoval,* 532 U.S. at 279–80, 121 S.Ct. 1511. By contrast, the Court in *Gonzaga* found that language in the Family Educational Rights and Privacy Act (FERPA) prohibiting the Secretary of Education from making funds available to an institution that engaged in certain policies or practices did not create an individual right. *Id.* "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Id.* (citing *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511) (internal citation omitted). Similarly, statutes that "create duties on the part of persons for the benefit of the public at large" generally do not confer individual rights. *Cannon,* 441 U.S. at 690 n. 13, 99 S.Ct. 1946 (citing cases).

The Court applies the rules enunciated in *Gonzaga* to determine if either of the statutory sections under which Plaintiff has sued creates a right in *any* individual. If Section 13(A) or 30(A) creates such rights, they are enforceable under Section 1983 since it is generally accepted that Title XIX does not explicitly foreclose private causes of action. *See Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 523, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

3. Existence of Section 1983 Cause of Action Under Section 13(A) [3]

Section 13(A) mandates that a state plan "provide ... for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which ... providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates..." 42 U.S.C. § 1396a(a)(13)(A)(ii). This language speaks both in terms of a class of individuals benefited ("providers, beneficiaries and their representatives, and other concerned State residents"), and a duty of the state to provide those individuals with "a reasonable opportunity for review and comment...." *Id.* Thus, it satisfies the basic criteria of *Gonzaga.*

■ Defendant objects that the *scope* of the class of individuals to whom the right is conferred is too broad to meet the *Gonzaga* standard. Defendant reads the phrase "providers, beneficiaries ... and other concerned State residents" to encompass effectively *all* residents of Maine, rendering the statute one that gives a right to the public at large, rather than to an identifiable class. *See Cannon,* 441 U.S. at 690 n. 13, 99 S.Ct. 1946. However, the Court must read a general statutory term that follows specific statutory terms as embracing only things of the same general class as those enumerated. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (discussing doctrine of esjudem generis); *Berniger v. Meadow Green–Wildcat Corp.,* 945 F.2d 4, 8–9 (1st Cir. 1991). Accordingly, the Court rejects Defendant's interpretation as too broad. The phrase refers *only* to providers and beneficiaries of "nursing facilities services, hospital services, and services of intermediate

---

**3.** Few courts have addressed whether this section creates a right enforceable under Section 1983, and none have done so post-*Gonzaga. See Evergreen Presbyterian Ministries, Inc. v. Hood,* 116 F.Supp.2d 745 (W.D.La.2000)

(finding a cause of action to enforce Section 13(A) via Section 1983, but applying pre-*Gonzaga* case law) (vacated on other grounds, 235 F.3d 908 (5th Cir.2000)).

care facilities for the mentally retarded," and persons with interests akin to those of the providers and beneficiaries.

■ The Court therefore concludes that the language of Section 13(A) supports a cause of action pursuant to Section 1983 by those individuals. A provider of, beneficiary of, or State resident with similar interests in, hospital services, nursing facility services, or services of an intermediate care facility for the mentally retarded may enforce the right guaranteed by Section 13(A) via a private action. That right consists of a reasonable opportunity to comment on changes to the rate of reimbursement for those particular services.[4]

4. Existence of a Section 1983 Cause of Action Under Section 30(A).

Section 30(A) instructs states to include in their Medicaid plans such "methods and procedures . . . as may be necessary . . . to assure that payments [to providers] are consistent with efficiency, economy and quality of care and are sufficient to enlist enough providers [to ensure equal access to healthcare for Medicaid recipients]." 42 U.S.C. § 1396a(a)(30)(A). In *Visiting Nurse Ass'n v. Bullen*, 93 F.3d 997 (1st Cir.1996), the Court of Appeals held that Medicaid service providers may enforce Section 30(A) via a Section 1983 action.

The Circuit Court found that the substantive provisions of Section 30(A) were analogous to provisions contained in a since-repealed version of Section 13(A) known as the "Boren Amendment," which outlined substantive, rather than procedural, requirements for rates of reimbursement for Medicaid services.[5] It noted that in *Wilder v. Virginia Hospital Association*, 496 U.S. at 498, 110 S.Ct. 2510, the Supreme Court had found that the Boren Amendment created a right in Medicaid service providers "to have the State adopt rates that it finds are reasonable and adequate to meet the costs of an efficient and economical health care provider." *Id.* at 524, 110 S.Ct. 2510. The *Bullen* court determined that because the Boren Amendment and Section 30(A) contained "nearly identical substantive requirements," *Wilder* supported the conclusion that a plaintiff could maintain a Section 1983 action to enforce Section 30(A) as well. *Bullen*, 93 F.3d at 1005; *see also Methodist Hosps. v. Sullivan*, 91 F.3d 1026 (7th Cir.1996) (reaching same conclusion); *Arkansas Med. Soc'y v. Reynolds*, 6 F.3d 519 (8th Cir.1993) (same).

However, *Bullen*'s continued viability post-*Gonzaga* is in some doubt. The *Bullen* court found that because Section 30(A) mentions "providers," and providers are affected by substantive changes in Medicaid reimbursement rates, Congress must

---

**4.** This conclusion is consistent with dicta in *Wilder*, in which the majority and dissent agreed that, at a minimum, compliance with old Section 13(A)'s "bare procedural requirement" of making findings that reimbursement rates were "reasonable and adequate" was enforceable pursuant to section 1983. *Wilder*, 496 U.S. at 512–13, 527–28, 110 S.Ct. 2510 (Rehnquist, C.J. dissenting).

**5.** The "Boren Amendment" mandated that state Medicaid plans provide

for payment . . . of hospital services, nursing facilities and services in an intermediate care facility for the mentally retarded provided under the plan through the use of

rates . . . which the States finds . . . are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic locations and reasonable travel time) to inpatient hospital services of adequate quality . . .

42 U.S.C. § 1396a(a)(13)(A) (repealed). Congress replaced the Boren Amendment with Section 13(A)'s current language.

have intended Section 30(A) to benefit them. *Bullen*, 93 F.3d at 1003–04. By contrast, in *Pennsylvania Pharmacists Association*, the Third Circuit concluded that under the "implied right of action" doctrine, Section 30(A) would not support a Section 1983 action.[6] *Pa. Pharmacists Ass'n*, 283 F.3d at 537–40. Utilizing reasoning similar to the Court's in *Gonzaga*, the *Pharmacists Association* court determined that the language of Section 30(A) did not indicate that Congress intended that section to benefit Medicaid service providers, because its terminology was focused on beneficiaries and the state, rather than providers. *Id.*

■ Nevertheless, *Bullen* is the First Circuit's last, clear word on the subject and the Court is bound to follow it. *See, e.g., Am. Soc'y of Consultant Pharmacists v. Garner*, 180 F.Supp.2d 953, 972–73 (N.D.Ill.2001) (rejecting defendant's argument that Section 30(A) is not enforceable pursuant to Section 1983, on the basis that *Methodist Hospitals* is binding, if doubtful, precedent). At present, Section 30(A) creates a right in Medicaid service providers to rates of reimbursement that are consistent with the goals of economy, efficiency, quality of care and equal access, enforceable via Section 1983 actions.

The parties dispute whether the Section 30(A) also creates a right in providers to have the State follow a specific methodology that explicitly takes into account each Section 30(A) factor—economy, efficiency, quality of care and equal access—in arriving at rates of reimbursement. *Compare Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1500 (9th Cir.1997) (holding that specific methodology is required); *Arkansas Med. Soc'y*, 6 F.3d at 530 (same); *with Rite Aid, Inc. v. Houstoun*, 171 F.3d 842, 852 (3rd Cir.1999) (holding that no particu-

lar methodology required); *Methodist Hosp.*, 91 F.3d at 1026 (holding that result of rulemaking, not procedure, is purpose of 30(A)). The Court declines to decide that issue because it finds below that Plaintiff has not demonstrated that Defendant failed to consider the factors.

B. Merits of Plaintiff's Claims

Although the Court has concluded that Sections 13(A) and 30(A) create rights enforceable pursuant to Section 1983, that is not the end of its inquiry. It still remains to be seen whether Plaintiff has shown, *in this case*, a likelihood of success on the merits of its claims that the rights protected by those sections have been violated.

1. Section 13(A)

■ Providers and beneficiaries of nursing facility services, hospital services and services of intermediate care facilities for the mentally retarded, and other State residents with interests akin to those providers and beneficiaries, may sue under Section 1983 for violation of Section 13(A)'s guarantee of a "reasonable opportunity to comment" on a change in the rate of service reimbursement. Plaintiff alleges that Defendant violated Section 13(A) by issuing the emergency rule without giving pharmacists a reasonable opportunity to comment on the proposed AWP rate cut. Defendant protests that the statute only guarantees a "public process for determination of rates of payment *for hospital services, nursing facility services, and services for intermediate care facilities for the mentally retarded* . . . . " 42 U.S.C. § 1396a(a)(13)(A) (emphasis added). According to Defendant, it does not provide *any* right with respect to reimbursement for prescription-filling services.

---

**6.** *Pennsylvania Pharmacists Ass'n,* which was decided in March, 2002, anticipated the Su-

preme Court's reasoning in *Gonzaga,* which was issued three months later.

Plaintiff concedes that its members provide neither hospital services nor intermediate care facilities for the mentally retarded. In insists, however, that they provide "nursing facility services" within the definition of the statute, and therefore that the AWP rate cut qualifies as a change in the "rate of payment for . . . nursing facility services." This reasoning, although flawed, is not without support in the statutory language. The Medicaid statute defines "nursing facility services" as

> services which are or were required to be given an individual who needs or needed on a daily basis nursing care (provided directly by or requiring the supervision of nursing personnel) or other rehabilitation services which as a practical matter can only be provided in a nursing facility on an inpatient basis.

42 U.S.C. § 1396d(f). For elaboration of the term "services . . . required to be given," the Court looks to the implementing regulations, which require that a nursing facility "provide routine and emergency drugs and biologicals to its residents, or obtain them under an agreement [with an outside pharmacist]." 42 C.F.R. § 483.60 (emphasis added). Taken out of context, it is plausible to read the regulation and statute together to conclude that filling prescriptions is a "nursing facility service."

Yet this conclusion is belied by its larger implications, which would lead to an absurd rule. The AWP rate, approved by the federal DHHS, applies to the reimbursement rate for *all* prescriptions filled for Medicaid recipients, not merely those living in nursing facilities. It affects *every* pharmacy serving Medicaid recipients in Maine. By Plaintiff's interpretation, how-ever, even a pharmacy that does not fill prescriptions for nursing facility residents would be deemed to perform "nursing facility services" under the statute. That simply cannot be the case. Interpreting "rate of payment . . . for nursing facility services" to include the reimbursement rates for prescription-filling services, some portion of which do not involve nursing facilities *at all*, would represent an ill-advised broadening of the statutory language, exposing rates of reimbursement for all manner of services only partially performed on behalf of nursing facilities to challenge under Section 13(A).[7] Thus, although Section 13(A) guarantees the right to comment on proposed changes to rates of reimbursement for nursing facility services, the rate change Plaintiff challenges does not relate to those services. Plaintiff has therefore failed to demonstrate a likelihood of success on the merits of its Section 13(A) claim.

### 2. Section 30(A)

Plaintiff argues that its members suffered procedural and substantive violations of Section 30(A) when Defendant issued its emergency rule, and that Defendant violated the notice provisions of the statute's implementing regulations as well. As to the procedural claim, Plaintiff argues that, in contemplating the emergency rule, Defendant took *only* economy (that is, the State's fiscal crisis) into account, and ignored its duty also to consider efficiency, quality of care and equal access. As the Court discussed above, it is not clear whether the procedural component of Section 30(A) is even enforceable, but the Court need not address that question be-

---

7. By Plaintiff's reasoning, for instance, a "nursing facility service" would also include the services a nursing facility obtains from outside physicians, 42 C.F.R. § 483.40, dieti-cians (§ 483.35), dentists (§ 483.55), and physical, speech and occupational therapists (§ 483.45).

cause Plaintiff has failed to present evidence sufficient to support its allegation.

■ The evidence at the August 6 hearing was that Defendant took the four factors into account in coming to its decision to alter the AWP formula. Eugene Gessow testified that BMS considered the impact of its rule on the State budget, and the expected effect of the rule upon the ability of Medicaid-participating pharmacists to continue to provide services. It took into account various studies of pharmaceutical reimbursement rates, and heard objections from the Maine legislature. In short, it engaged in a thorough, exhaustive review of its options in light of the Governor's requirement that the budget be reduced. Plaintiff presented scant evidence to counter this testimony—certainly not enough to meet its burden of making a "clear showing" of its likelihood of success on the merits. *Garner,* 180 F.Supp.2d at 974 (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). Accordingly, Plaintiff has failed to demonstrate a likelihood of success on the procedural component of its Section 30(A) claim.

Plaintiff also argues that regardless of whether Defendant considered the goals of economy, efficiency, quality of care and equality of access that Section 30(A) mandates, the resultant emergency rule does not meet those goals. The only evidence Plaintiff presented at hearing to this effect, however, was the testimony of a Medicaid-participating pharmacist who worried that the rate would harm his business, but testified that the rule would have to be in effect for three or four months before he would know for sure. Moreover, Plaintiff presented no evidence to prove that Maine Medicaid *recipients* would suffer a decline in their access to or quality of pharmacy services as a result of the rate change. Such scant evidence of the negative effect

of the rule does not satisfy Plaintiff's burden of "clearly" demonstrating a likelihood of success on the merits.

Finally, Plaintiff argues that when Defendant issued the emergency rule, it violated the notice requirements of 42 C.F.R. § 447.205(c), a regulation implementing Section 30(A). Section 447.205 requires Defendant to post public notice of any "significant proposed change in its methods and standards for setting payment rates for services," and enumerates the necessary contents of the notice. Defendant concedes that the notices published in Bangor and Portland newspapers failed to satisfy one of those requirements by not stating the decrease in aggregate annual expenditures it expected to make as a result of the rule. It argues, however, that this failure does not warrant enjoining enforcement of the rule altogether.

The Court notes at the outset that in *Bullen,* the Circuit Court "reserve[d] judgment" on whether regulations pursuant to 30(A) providing for public notice of new "methods and procedures" could give rise to a cause of action under section 1983. *Bullen,* 93 F.3d at 1006 n. 9; *compare Okla. Nursing Home Ass'n v. Demps,* 792 F.Supp. 721, 725–26 (W.D.Okla.1992) *with Kan. Hosp. Ass'n v. Whiteman,* 835 F.Supp. 1556, 1573 (D.Kan.1993). To the extent such a cause of action does exist, however, it appears that Plaintiff has demonstrated a likelihood of success on the merits of its claim.

The Court will not issue a preliminary injunction on this factor alone, however, and the Court finds that it would not be in the public interest to enjoin enforcement of the emergency rule for a minor violation of 447.205(c)'s notice requirements. *See Planned Parenthood League,* 641 F.2d at 1009.

C. State Law Justifications for Injunctive Relief

Because the Court finds that Plaintiff has failed to demonstrate a likelihood of success on the merits of its claim, it need not reach a discussion of the merits of its state causes of action. *See Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir.1995).

III. CONCLUSIONS OF LAW

In accordance with the foregoing discussion, the Court makes the following conclusions of law.

1. Although 42 U.S.C. § 1396a(a)(13)(A)(ii) may be enforced via a Section 1983 action by plaintiffs who do not receive reasonable opportunity to comment on a change in the rate of reimbursement for nursing facility services, the rate reduction implemented by Defendant's July 1, 2002, emergency rule did not affect nursing facility services; Plaintiff therefore has not demonstrated a likelihood of success on the merits of that claim.

2. Although Plaintiff may maintain a cause of action pursuant to 42 U.S.C. § 1983 for violation of 42 U.S.C. § 1396a(a)(30)(A), it has failed to demonstrate that Defendant violated that statute's procedural or substantive requirements, and therefore has not clearly shown that it is likely to succeed on the merits of those claims.

3. Although Plaintiff has demonstrated a likelihood of success on the merits of its claim for violation of the notice requirements of 42 C.F.R. § 447.205(c), it would not be in the public interest to enjoin enforcement of Defendant's emergency rule because of that violation.

4. The Court will not enjoin Defendant's July 1, 2002, emergency rule.

SO ORDERED.