LONG TERM CARE PHARMACY
ALLIANCE, Plaintiff,

v.

Christine C. FERGUSON, Acting Di-
rector, Commonwealth of Massachu-
setts Division of Health Care Finance
and Policy, Defendant.

No. 03–10577JLT.

United States District Court,
D. Massachusetts.

April 1, 2003.

David Farber, John Rosans, Patton Boggs LLP, Washington DC, for Long Term Care Pharmacy Alliance, Plaintiff.

Mark E. Robinson, Daniel S. Savrin, Melissa Georgia Liazos, Bingham McCutchen LLP, Boston, MA, for Pharmacy Alliance, Plaintiff.

William W. Porter, Stephanie S. Lovell, Romeo G. Camba, Attorney General's Office, Boston, MA, for Christine C. Ferguson, Acting Director of Commonwealth of Massachusetts Division Of Health Care Finance And Policy, Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

TAURO, District Judge.

Plaintiff Long Term Care Pharmacy Alliance ("LTCPA") has filed a motion for temporary restraining order and prelimi-

nary injunction seeking to enjoin defendant Christine C. Ferguson from enforcing her Emergency Rule, scheduled to go into effect April 1, 2003, to the extent that it would reduce the reimbursement rate as it applies to long-term care pharmacies providing pharmacy services to nursing facility residents who participate in the MassHealth (the "April 1 Rate"). For the reasons set forth herein, Plaintiff's Motion is granted, and Defendant is enjoined from implementing the April 1 Rate for any Medicaid prescription dispensed to a MassHealth nursing facility resident until such time as Defendant complies with federal Medicaid statutory requirements.

### FINDINGS OF FACT

**The Massachusetts Medicaid Program and Defendant Ferguson.**

1. This action involves the Commonwealth of Massachusetts's obligation to reimburse long-term care pharmacies providing prescription drugs to beneficiaries of Massachusetts's Medicaid program (also known as "Mass-Health"). Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to participating states that choose to reimburse certain costs of medical treatment for needy individuals. Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* (the "Medicaid Act"). Participation in the Medicaid program is voluntary. However, if a state elects to participate, it must comply with the requirements of Title XIX and the implementing regulations promulgated by the Secretary of Health and Human Services (the "Secretary"). *See* 42 C.F.R. §§ 430.1 *et seq.* and 447.302. Massachusetts has elected to participate in the program. *See* Mass. Gen. Laws ch. 118E, § 11.

2. The Medicaid Act requires states to pay for certain services, and it gives them the option to provide additional services, all of which can be subject to in excess of 50 percent reimbursement by the Federal Government. Each state may determine through statute or rulemaking what it will pay for services provided to Medicaid recipients, so long as the payments are consistent with federal law. Payments are made directly by the state to providers furnishing the services to Medicaid beneficiaries—in this case, eligible long-term care pharmacies. DHCFP sets the rates at which the Commonwealth pays long-term pharmacy providers for services to Medicaid patients. The Commonwealth of Massachusetts, through its Division of Medical Assistance ("DMA"), operates its own Medicaid program and pays for prescription drugs under its State Plan pursuant to the rates set by DHCFP. Mass. Medicaid State Plan § 3.1, Supp. 1 to Attachment 3.1–A. In turn, the Commonwealth is reimbursed by the Federal Government 50 cents for each dollar it expends on the program.

3. As a part of its obligations under the federal Medicaid program, and to be eligible for federal funding, Massachusetts (and every other state) must submit to the Center for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services ("HHS"), a state plan which complies with the federal law. *See* 42 U.S.C. § 1396; *see also* § 1396a(a). The Secretary of HHS has approved Massachusetts's plan and reimburses Massachusetts for 50 percent of the state's payments to providers, including LTCPA members.

**Plaintiff Long Term Care Pharmacy Alliance**

4. Plaintiff Long Term Care Pharmacy Alliance represents the four major national long-term care pharmacies—Kindred Pharmacy Services, Omnicare, NeighborCare, and PharMerica. Plaintiff's Memorandum in Support of Motion for Temporary Restraining Order at 5. Plaintiff's members operate "long-term care" pharmacies dedicated to providing services to residents of nursing facilities. Unlike retail pharmacies, Plaintiff's members operate "closed pharmacies," meaning they are not open to the public, and do not provide retail services. The vast majority of prescriptions that LTCPA member pharmacies provide are to nursing facilities and their residents. Dulac Decl. ¶ 15.

5. Nursing facility residents are typically among the nation's most frail and elderly, and typically require seven or more medications. To accommodate these medication needs, long-term care pharmacies have developed a highly sophisticated delivery and distribution system to avoid medication errors. Dulac Decl. ¶ 5. These systems include specialized unit dose packaging (such as a so-called "bingo card" that lets the nurse punch out each pill on a card bar-coded for each patient), drug regimen reviews to avoid inappropriate drug interactions, and 24/7 deliveries (to allow medication and IV treatments in the nursing home, rather than moving the resident to a hospital). See Dulac Decl. ¶ 5. Nursing facility residents are unable to go to a retail pharmacy to obtain their prescription drugs but must have them delivered by a long term care pharmacy.

6. In addition to these unique packaging services, LTCPA members also provide a wide array of consulting pharmacist services for the unique elderly patient population that they serve, including drug regimen reviews, drug interaction analyses, and patient chart screenings. *See* Dulac Decl. ¶ 6. Plaintiff's members also provide "24/7" delivery, so that residents do not have to be transported to hospitals when, for example, they need an IV. Dulac Decl. ¶ 5. These critical services are intended to provide the very frail and elderly residents commonly found in nursing home settings with appropriate medical care without inappropriate drug interaction, incorrect or duplicative prescriptions, or inappropriate medications.

**The April 1 Emergency Rate.**

7. On March 17, 2003, Defendant Ferguson and the Massachusetts Office of Health and Human Services ("MHHS"), Division of Health Care Finance and Policy ("DHCFP"), issued a notice on the DHCFP website announcing a reduction in the reimbursement rates for prescription medications dispensed under the Massachusetts Medicaid program.

8. The emergency rule, amending 114.3 Code Mass. Regs. § 31.00, attached to the Verified Complaint, Exhibits 2 and 3, is scheduled to go into effect April 1, 2003, and will reduce reimbursements to Medicaid pharmacies by, among other things, reducing the Estimated Acquisition Cost ("EAC") from the Wholesaler's Acquisition Cost ("WAC") plus 6% to WAC plus 5%. *Id.* No public notice or opportunity for comment or hearing was given to providers or beneficiaries, including Plaintiff here. Dulac Decl. ¶ 8.

9. Only six months ago, on September 5 and 6, 2002, DHCFP held extensive

public hearings to determine what payment levels would adequately ensure pharmacy participation in the Massachusetts Medicaid program to maintain sufficient access for MassHealth members. Based on proper notice and comment rulemaking, including testimony at the hearings and its review of relevant data, DHCFP established in October 2002 a rate at WAC plus 6%, reducing the previous rate of WAC plus 10%. Verified Complaint, Exhibit 1.

10. The March 2003 notice contemplates a hearing on the Emergency Rule on May 7, 2003, some six weeks after the Emergency Rule is scheduled to go into effect. Verified Complaint, Exhibit 2. The notice states: "[I]t is estimated that aggregate Medicaid expenditures will decrease by approximately $26 million annually as a result of" the Emergency Rule. *Id.* Defendant admitted at the hearing that the sole motivation for the Emergency Rule was to expedite the decrease in reimbursement rates in order to address the Commonwealth's fiscal crisis.

11. In its rate-making last October, DHCFP specifically found the WAC plus 6% rate was necessary "to ensure sufficient access to pharmacy services for MassHealth members." *See* Verified Complaint, Exhibit 1 at 1, 14. Since that time, DHCFP has neither procured nor provided any comments, testimony, data, or findings of any kind to support a further reduction in this reimbursement rate or ensure sufficient continued access to pharmacy services for MassHealth members.

12. By its emergency rule, however, DHCFP seeks to change the rate, without any additional record evidence, public comment, or hearing testimony. Verified Complaint, Exhibit 2.

## CONCLUSIONS OF LAW

13. The Pharmacy Reimbursement Change constitutes an unlawful reduction in the rate at which long-term care pharmacies are reimbursed for providing nursing facility services in the form of prescription drugs to Massachusetts's Medicaid beneficiaries. More specifically, the Emergency Rule violates the following federal laws:

42 U.S.C. § 1396a(13)(A), which grants Plaintiff specific rights to participate in and comment upon proposed rates. Defendant Ferguson denied Plaintiff any right or participation in the rate-making process, in violation of federal law;

42 U.S.C. § 1396a(30)(A), which requires Massachusetts to make specific findings that its rates will allow beneficiaries equal access to Medicaid benefits, including the pharmaceutical services at issue here. The Emergency Rule violates each of the four considerations mandated by Section 30(A); and

42 C.F.R. § 447.205 and 447.253, which clarify the specific statutory rights and require that the rates be public, disclosed, adequate, and reasonable. No such findings were made here.

## Preliminary Injunction Standard.

14. Whether or not a court should issue a temporary restraining order or preliminary injunction depends on four factors: (1) plaintiff's likelihood of success on the merits; (2) the likelihood of irreparable harm if the injunction is not granted; (3) the balancing of this harm to the plaintiff with the harm that a grant of injunctive relief would inflict on the defendant; and (4) whether the

granting of injunctive relief will serve the public interest. *New Comm Wireless Serv., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 8–9 (1st Cir.2002); *Utility Contractors Ass'n of New England, Inc. v. City of Worcester,* 236 F.Supp.2d 113, 116 (D.Mass.2002). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Serv., Inc.,* 287 F.3d at 9, *citing Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir. 1993).

15. Allegations of statutory violations implicate a different calculus because such violations inherently offend the public interest. The need to demonstrate irreparable harm, a condition precedent to the grant of injunctive relief in civil litigation, is not a prerequisite where a plaintiff attempts to enforce a statute. *United States v. D'Annolfo,* 474 F.Supp. 220, 222 (D.Mass.1979) (when a party "acts to enforce a statute or make effective a declared policy of Congress, the standard of public interest and not the requirements of private litigation measure the propriety and need for injunctive relief") (internal citations omitted); *United States v. Richlyn Labs., Inc.,* 827 F.Supp. 1145, 1150 (E.D.Pa.1992) ("The passage of the Food, Drug and Cosmetic Act is, in a sense, an implied finding that violations will harm the public and ought to be restrained if necessary"); *see also Government of the Virgin Islands v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 286 (3d Cir.1983) ("Nor is the irreparable harm factor a significant hurdle to a preliminary injunction in most statutory violation cases"). In this case, the violations of the federal Medicaid Act and federal Medicaid regulations necessarily inflict irreparable harm upon the persons they were designed to serve and protect. However, although the Court can grant injunctive relief based upon the likelihood of success on the merits, the balancing of the other factors also favors injunctive relief here.

**Plaintiff's Standing To Assert Its Claims**

16. Before addressing the merits of Plaintiff's claim, the Court first examines the threshold issue of whether Plaintiff has standing to assert its claims. Both beneficiaries and providers (such as LTCPA, on behalf of its members) have standing to assert a Section 1983 private action against state officials for violations of federal statutory rights such as those claimed by LTCPA. 42 U.S.C. § 1983; *see also Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen,* 93 F.3d 997, 1002 (1st Cir.1996), *cert. denied,* 519 U.S. 1114, 117 S.Ct. 955, 136 L.Ed.2d 842 (1997) (expressly finding providers have standing to assert Section 1983 actions involving reimbursement rates); *Westside Mothers v. Haveman,* 289 F.3d 852 (6th Cir.2002), *cert denied,* —— U.S. ——, 123 S.Ct. 618, 154 L.Ed.2d 516 (2002) (collecting cases); *ASCP v. Concannon,* 214 F.Supp.2d 23, 29 (D.Me.2002) (directly holding that providers have standing to assert Section 13(A) claims).

17. To determine whether a statutory provision creates an enforceable right, courts examine (1) whether Congress intended the statute to benefit plaintiffs; (2) whether the statute expresses a Congressional preference or binding obligation; and (3) whether the right is "too vague and amor-

phous such that it is beyond the competence of the judiciary to enforce." *Visiting Nurses,* 93 F.3d at 1002, *quoting Wilder,* 496 U.S. at 509, 110 S.Ct. 2510: *Rosie D, ex rel. John D. v. Swift,* 310 F.3d 230 (1st Cir.2002). If these factors are met, there is a rebuttable presumption "that the right is enforceable under § 1983," *Blessing v. Freestone,* 520 U.S. 329, 341, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), which can be overcome only by demonstrating that "Congress specifically foreclosed a remedy under § 1983." *Doe v. Chiles,* 136 F.3d 709, 718–19 (11th Cir.1998), *quoting Blessing,* 520 U.S. at 341, 117 S.Ct. 1353. Defendant raises no argument to overcome the presumption here.

■ 18. Congress clearly intended for Section 13(A) to benefit beneficiaries and providers. The plain language of Section 13(A) specifically requires that "providers, beneficiaries and their representatives" be "given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications." 42 U.S.C. § 1396a(a)(13)(A)(ii). The provision also unambiguously creates a binding obligation on Massachusetts by speaking in mandatory, rather than permissive, terms ("A State plan for medical assistance *must* ... provide for a public process for determination of rates of payment under the plan for ... nursing facility services") (emphasis supplied). Finally, Section 13(A) provides a set of clear and understandable requirements that are within judicial competence to enforce. Section 13(A) mandates the use of a "public process" for determining rates of payment. As such, Section 13(A) establishes a clear right enforceable by the judiciary.

### The Pharmacy Reimbursement Change Violates Section 13(A) of the Federal Medicaid Act.

■ 19. Defendant's Emergency Rule violates 42 U.S.C. § 1396a(a)(13)(A) ("Section 13(A)") because she failed to provide the public process mandated by Congress for changing Medicaid provider rates. Section 13(A), in very direct and plain terms, requires participating states to:

provide for a ***public process for determination of rates of payment*** under the [State] plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which-

(i) proposed ***rates,*** the methodology underlying the establishment of such rates, and justification for the proposed rates are published,

(ii) providers, beneficiaries and their representatives, and other concerned State residents are given a ***reasonable opportunity for review and comment on the proposed rates,*** methodologies, and justifications, [and]

(iii) final rates, the methodology underlying the establishment of such rates, and justification for such final rates, and justification for such rates are published...

42 U.S.C. § 1396a(a)(13)(A) (emphasis supplied). The statute could not be clearer: Defendant must provide a "public process" with a "reasonable opportunity for review" before implementing any rate changes for nursing facility services. As explained in *Children's Seashore House v. Waldman,* 197 F.3d 654, 660 (3d Cir.1999), *cert. denied,* 530 U.S. 1275, 120 S.Ct. 2742, 147 L.Ed.2d 1006 (2000):

The process requires publication of the proposed rates together with the meth-

odology and justifications used to establish those rates. Providers, beneficiaries, and other concerned state residents must be given a reasonable opportunity for review of and comment on the proposed rates, methodologies, and justifications. Then the final rates, as well as methodologies and justifications for the rates, must be published.

■ 20. Section 13(A) applies to "providers" of "hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded." Plaintiff's members are providers of "nursing facility services."

21. "Nursing facility services" are expressly defined and explained in at least two places in the Medicaid statute. First, 42 U.S.C. § 1396d(f) defines "nursing facility services" as "services which are or were required to be given an individual who needs or needed on a daily basis nursing care (provided directly by or requiring the supervision of nursing personnel) ... which as a practical matter can only be provided in a nursing facility on an inpatient basis." Prescription drugs dispensed to nursing home residents meet this definition, as they are needed by residents, are often provided under the supervision of nursing personnel, and are administered on an inpatient basis.

■ 22. Second, 42 U.S.C. § 1396r(b)(4)(A)(iii) explicitly requires nursing facilities to provide, among other services, "pharmaceutical services." Federal regulations contain similar service requirements for nursing facilities. *See* 42 C.F.R. §§ 483.5 (defining *facility to include nursing facility*); 483.60 (requiring "facilities" to provide prescription drugs). When Congress in 1997 amended the Boren Amendment and utilized the term "nursing facility services," it is presumed to have been aware of the pre-existing statutory definitions. *Strickland v. Commissioner*, 96 F.3d 542, 547 (1st Cir. 1996). Moreover, the Court is obligated to defer to the U.S. Department of Health and Human Service's regulatory definition of the term. *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 281 (3d Cir.2002), *quoting U.S. v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Cleary v. Waldman*, 167 F.3d 801 (3d Cir. 1999), *cert. denied*, 528 U.S. 870, 120 S.Ct. 170, 145 L.Ed.2d 144 (1999). The prescription drugs dispensed by Plaintiff's members squarely meet that statutory definition. Dulac Dec. ¶ 15.

23. *ASCP v. Concannon*, 214 F.Supp.2d 23, *supra*, is not to the contrary. In that decision, District Court Judge Singal found that the statute and regulation, when read together, supported the conclusion that prescription drugs met the definition of "nursing facility services" but he refused to extend that conclusion to also encompass "reimbursement for *all* prescriptions filled for Medicaid recipients, not merely those living in nursing facility services." 214 F.Supp.2d at 31 (emphasis in original). In contrast, Plaintiff here only provides prescription drugs to nursing facility residents, and does not seek to have its injunctive relief apply to all Medicaid prescription drugs. Rather, plaintiff only seeks an injunction under section 13(A) for drugs

dispensed to MassHealth nursing facility residents.

24. The plain language of the statute speaks of "providers" of hospital "services," nursing facility "services" and ICF "services" as being entitled to the 13(A) procedural protections. The classification of Plaintiff's members state pharmacist licenses as "retail," Mass. Gen. Law ch. 112, § 39, and the absence of a state licensure category for "long term care pharmacies," do not trump the federal statutory and legal definitions. Rather, Constitutional Supremacy Clause principles dictate that federal law controls the definition of "nursing facility services" here. *Mass. Gen. Hosp. v. Sargent*, 397 F.Supp. 1056, 1057 (D.Mass. 1975).

25. By issuing the rate change as an emergency rule, Defendant violated Plaintiff's members' right to a public rate-setting process. Defendant also denied providers of prescription drugs to nursing facilities the opportunity to review and comment on the proposed rate changes, methodologies, or the Commonwealth's justifications *before* the new rates are to go into effect. "Where interested persons have not been afforded an opportunity to comment ... it is more likely that significant factors will be overlooked or too easily discounted. In contrast, ... inviting public comment ... provides further assurance of agency exposure to the various considerations, and militates against the post hoc review of the agency's reasoning process." *Kollett v. Harris*, 619 F.2d 134, 140 n. 5 (1st Cir. 1980); *see also Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123, 130 n. 9 (3d Cir.1993).

## The Pharmacy Reimbursement Change Also Violates Medicaid Statutory Equal Access Requirements.

26. Defendant's Emergency Rule violates a second Medicaid requirement—the Equal Access provision. *See* 42 U.S.C. § 1396a(a)(30)(A). The Equal Access provision requires participating states to set reimbursement rates at a level that will:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

27. 42 U.S.C. § 1396a(30)(A); *see also* 42 C.F.R. § 447.204. Defendant, however, has failed to meet both the procedural and substantive requirements of Section 30(A).

28. Defendant's Emergency Rule contradicts the recent findings of her own agency—the DHCFP. There has been extensive debate in the last nine months regarding cuts to Medicaid reimbursement rates in the Commonwealth. *See* Dulac Decl. ¶¶ 9 and 14. After the Legislature initially proposed severe rate cuts as low as WAC minus 2%, the Division of Health Care Finance and Policy responded and held extensive public hearings on September 5 and 6, 2002, and based on testimony and review of relevant data, established an EAC equal to WAC plus 6%. *See* Verified Com-

plaint, Exhibit 1 at 2. In its October 3, 2002 Report to the General Court, the Division of Health Care Finance and Policy found that this WAC plus 6% figure was needed "to ensure that MassHealth members will have sufficient access to prescribed drugs." *Id.* at 16. The Commonwealth could have chosen WAC plus 5%, but did not, because as the DHCFP report recites, WAC plus 6% was determined by the DHCFP to be the rate necessary to conform with federal requirements.

29. Despite these recent explicit findings, Defendant has arbitrarily promulgated the Emergency Rule without prior consideration of the four Section 30(A) factors: (1) equal access, (2) efficiency, (3) economy, and (4) quality of care. *Arkansas Med. Soc'y v. Reynolds*, 6 F.3d 519, 530 (8th Cir. 1993); *see also, Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1500 (9th Cir. 1997).

30. Defendant has not permitted any notice and comment similar to the proceeding just recently concluded that would allow for new evidence or assurances to modify the October 2002 report's finding that a WAC plus 6% rate was necessary to ensure equal access and quality of care. Verified Complaint, Exhibits 1–3. In the absence of such a finding, the Court has no way to know whether the new "Emergency rate" complies with the "equal access" mandates of Section 30(A).

31. There is evidence in the record that pharmacies, including Plaintiff's members, may have to reduce their services or curtail their participation in the MassHealth program. Dulac Decl. ¶¶ 10–14. While the Court takes no position on the merits of that evidence, it is precisely this evidence that Defendant should consider in notice and comment rulemaking on the proposed rate changes. Until the DHCFP can state, following notice and comment, that the proposed rate would also "ensure that MassHealth members will have sufficient access to prescribed drugs," the rate is in violation of 30(A). *See also* 42 C.F.R. § 447.253 (requiring such findings and assurances).

32. Unlike the limitations of Section 13(A) above, which by its terms only pertains to (as relevant here) providers of "nursing facility services," Section 30(A) applies to all prescription drugs in the MassHealth Medicaid program. Thus, the Court enjoins Defendant Ferguson from implementing the Emergency Rate until such time as she has complied with the requirements of Section 30(A) and can find, after notice and comment, that any proposed new rate will "ensure that MassHealth members will have sufficient access to prescribed drugs."

**Absent the Limited Injunctive Relief Sought, Plaintiff Will Be Irreparably Harmed.**

33. The Plaintiff has made a sufficient showing of irreparable harm if injunctive relief is not granted. The Medicaid statute's notice and comment provisions (especially those related to the most vulnerable populations in hospitals, nursing facilities and facilities for the mentally retarded) are included in the statute in order to ensure that any material actions taken by state regulators affecting these populations will be fully informed in terms of the impact

on patients prior to the action being taken.

34. In this case, the Commonwealth's action in imposing further cuts to the reimbursement without obtaining the input of the affected vulnerable populations potentially puts these patients at risk. To the extent that pharmacies servicing nursing facility residents are forced to cut back services, hours of operation, or reduce staff, Dulac Decl. ¶ 10, these harms are not compensable by money damages.

35. In addition to the serious potential of harm to nursing facility residents, Plaintiff will be irreparably harmed if Defendant violates the law. *D'Annolfo, supra,* 474 F.Supp. at 222; *Richlyn Laboratories, supra,* 827 F.Supp. at 1150; *Government of the Virgin Islands, supra,* 714 F.2d at 286. Irreparable harm can be presumed from the statutory violations at issue here.

36. Moreover, LTCPA and its members will suffer irreparable financial damage in lost reimbursements that they will be unable to recover. While financial loss is traditionally not deemed an irreparable harm, in this case, however, LTCPA members have no practical way to recoup reimbursements lost after the Emergency Rule takes effect. Recovery in this matter is prospective because, pursuant to the Eleventh Amendment, the State can assert sovereign immunity for any back-damage claims, barring any claims for recovery. *See, e.g., Mills v. Maine,* 118 F.3d 37, 54 (1st Cir. 1997) (explaining scope of sovereign immunity). Thus, irreparable injury exists here because sovereign immunity bars the possibility of recovering underpayments wrongfully made. *See, e.g., Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. and Rehab. Servs.,* 31 F.3d 1536, 1543 (10th Cir.1994) ("Because the Eleventh Amendment bars a legal remedy in damages, and the [district] court concluded no adequate state administrative remedy existed ... plaintiff's injury was irreparable"); *Kansas Hosp. Ass'n. v. Whiteman,* 835 F.Supp. 1556, 1563–64 (D.Kan.1993) (an Eleventh Amendment bar evidences irreparability), *aff'd,* 36 F.3d 1106 (10th Cir. 1994).

**Defendant Will Not Be Harmed by Issuance of the Relief Sought.**

37. Enjoining the adoption and implementation of the Pharmacy Reimbursement Change will cause comparably less harm to Defendant. If monetary loss does not constitute irreparable harm, that argument cuts against Defendant in this case, whose only risk is possibly losing money. Moreover, the Defendant admits that the Emergency Rule was implemented to aid the Commonwealth's current fiscal crisis. The Commonwealth, however, has numerous other ways to save money rather than unlawfully reducing its payments to Medicaid providers and jeopardizing the health and welfare of MassHealth nursing facility residents (not to mention losing the 50 cents on every dollar that the federal government will contribute to Massachusetts residents' care through its Medicaid match payment).

38. Defendant may not use the illegal Emergency Rule to supplement State coffers. As such, an injunction will preserve the status quo and produce

no added monetary loss. Thus, the Commonwealth will not suffer irreparable financial harm that cannot be made up in the future.

## Issuance of a Preliminary Injunction Will Not Be Adverse To the Public Interest.

39. The final factor for issuance of a preliminary injunction requires the Court to determine whether the preliminary injunction is "in the public interest." The public interest is served by enforcing the Federal and State Medicaid law. *See, e.g., Utility Contractors, supra,* 236 F.Supp.2d at 116 (public interest favors a preliminary injunction, enjoining enforcement of city ordinance which likely violated Privileges and Immunities Clause, because injunction would further social value of protecting public from unconstitutional laws); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C.Cir.1998) (affirming public interest in the "faithful application of the laws"). It is also in the public interest to maintain a Medicaid program that provides efficient, quality care. Because the Emergency Rule violates Federal law, places the care of Massachusetts' most vulnerable citizens at risk, and jeopardizes Massachusetts's entitlement to federal Medicaid matching funds, enjoining it is clearly in the public interest.

## LTCPA Does Not Have to Post a Bond

40. Fed.R.Civ.P. 65(c) normally requires the party obtaining injunctive relief to post a bond or other security. However, "the special nature of suits to enforce important federal rights or 'public interests' arising 'out of comprehensive federal health and welfare statutes'," often dictates that no bond need be posted. *Temple Univ. v. White,* 941 F.2d 201, 220 (3d Cir.1991), *quoting Crowley v. Local No. 82,* 679 F.2d 978, 1000 (1st Cir.1982), *rev'd on other grounds,* 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). Such is the case here. The waiver of a bond does not only apply to public interest groups, but to Medicaid providers as well. *Temple Univ., supra.* However, LTCPA's status as a trade association is further cause to exempt it from the bond requirements in this case. *Pharmaceutical Soc. of State of New York v. New York State Dep't of Social Services,* 50 F.3d 1168, 1174–75 (2d Cir.1995) (noting that Society's litigation was to pursue a public purpose of ensuring adequate rates so that providers did not "drop out of the Medicaid program").

41. LTCPA brought this suit to ensure that its member pharmacies are receiving sufficient and adequate reimbursement to allow them to continue to provide their specialty services to nursing facilities, and to ensure optimal care for nursing facility residents. Further, this suit seeks to enjoin Defendant from violating federal law. Any financial loss to Defendant is not irreversible, but rather, can be made up through other lawful means. As such, this suit is in the public interest, falling well within the exception to the bond requirement.

## CONCLUSION

For the foregoing reasons, the Court orders the following:

(1) Under Section 13(A), Defendant is enjoined from implementing the Emergency Rule for prescription drugs dispensed to MassHealth beneficiaries residing in nursing facilities until such time as Defendant

complies with the Notice and Comment requirements in that section. The statutory and regulatory definition of "nursing facility services" includes prescription drugs dispensed to nursing home residents by LTCPA's member long term care pharmacies; and

(2) Under Section 30(A), Defendant is enjoined from implementing the proposed Emergency Rule for prescription drugs dispensed to all MassHealth beneficiaries until such time as, following notice and comment rulemaking, the Defendant certifies to the satisfaction of the Court that the Emergency Rate complies with the 30(A) requirements; and

(3) The balance of hardships, Plaintiff's status as a trade association, and the special nature of suits to enforce important federal rights arising out of the federal health care statutes dictate that Plaintiff need not post a bond in this case.